## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NICK KOVACH,           )
                               )
       Plaintiff,           )    Civil Action No. 2:12-CV-00432
                               )
v.                           )
                               )    Judge Mark R. Hornak
TURNER DAIRY FARMS, INC.; SERVICE   )
PERSONNEL & EMPLOYEES of the DAIRY  )
INDUSTRY, LOCAL UNION NO. 205;     )
GREG SHAFER; and WILLIAM LICKERT   )
                               )
       Defendants.        )

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiff Nick Kovach claims in his 313 paragraph Third Amended Complaint that his labor union, and certain of its representatives, forced him to quit his job with Turner Dairy Farms, Inc., and placed him at the risk of serious bodily harm when a co-worker/Union steward threatened to beat him up and repeatedly tried to run him over with a truck all in retaliation for Plaintiff's actions as a Union member. He claims that Turner failed to put a stop to such activity when it had the duty and opportunity to do so.

Kovach filed this action against Turner Dairy Farms, Inc. ("Turner"), his Union -- Service Personnel and Employees of the Dairy Industry Local Union No. 205 ("Union"), -- and Union officials Greg Shafer and William Lickert, Jr. He alleges a wide variety of federal civil claims, some obvious in the circumstances alleged, many not. Plaintiff brings Counts I and II under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411, 501. Counts III, IV, V, and VI allege state law tort claims for Interference with Contractual

Relations and Economic Opportunities, Negligent Supervision and Retention, and Assault. Count VII is brought under the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq*. Count VIII is brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. Counts IX, X, and XI are brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.

Turner filed a Motion to Dismiss all claims against it, which consist of Counts V, VII, VIII, IX, X, and XI. The Union, Shafer, and Lickert filed a Motion to Dismiss all federal claims brought against them, which consist of Counts I, II, VII, IX, X, and XI.

The Motions to Dismiss are granted in part and denied in part. Specifically, the Motions to Dismiss are granted with regard to claims under 29 U.S.C. §411(a)(1) asserted in Count I, and as to Counts VII, VIII, IX, X, and XI. The Motions to Dismiss are otherwise denied.

## I.  PROCEDURAL POSTURE

Plaintiff brought this suit on April 4, 2012 and then amended his Complaint twice. ECF Nos. 1, 17, 33. All Defendants filed Motions to Dismiss following the original Complaint, the First Amended Complaint, and the Second Amended Complaint. ECF Nos. 12, 15, 18, 20, 34, 36. At oral argument the Defendants did not object to Plaintiff's request to file a Third Amended Complaint ("TAC") and stated that such Third Amended Complaint would not alter any existing Motions to Dismiss. The parties then stipulated that all previous Motions to Dismiss would apply with full force to the TAC.[1] Consequently, the Court will rely on Plaintiff's TAC, ECF No. 46, in considering the Motions to Dismiss.

---

[1] Saving the parties the expense of additional briefing, the Court did not require Defendants to re-file their Motions to Dismiss after the TAC had been filed.

2

## II.   FACTUAL BACKGROUND

When considering a motion to dismiss under Fed. R. Civ. P. 12, the Court must accept the factual allegations in the TAC as true and draw all reasonable inferences in the Plaintiff's favor. *Malleus v. George,* 641 F.3d 560, 563 (3d Cir. 2011). The factual allegations related here are taken from the TAC. ECF No. 46. Therefore, solely for the purposes of the disposition of Defendants' Motions to Dismiss, the essential facts are as follows.

Plaintiff is a 55-year-old male employed as a truck driver for Turner for 23 years. TAC at ¶¶ 8, 10. Local Union No. 205 represents the truck drivers at Turner. *Id.* at ¶ 3. Greg Shafer is also an employee at Turner, has been the Steward for the Union for at least five years, and allegedly held animosity towards Plaintiff for ten years prior to his becoming the Steward. *Id.* at ¶¶ 4, 28. William Lickert, Jr. is the Secretary-Treasurer and a principal officer of the Union. *Id.* at ¶ 5.

A Union ratification meeting was scheduled for May 1, 2011 to address Turner's proposal that it be permitted to assign Turner truck drivers to a four-day route (where the driver worked four (4) ten hour works days), instead of a five-day route (where the driver worked five (5) eight hour work days), without regard to seniority. *Id.* at ¶ 12. Union leadership favored the proposal and wanted the rank-and-file Union members to ratify it. *Id.* at ¶ 18. Plaintiff informed Shafer that he opposed this proposal and gave Shafer a signed document as his opposition vote in the event he did not make the Union meeting. *Id.* at ¶¶ 14-15. Because Plaintiff's wife suffered an eye injury, he was unable to attend the Union meeting. *Id.* at ¶¶ 16-17. Shafer later confronted Plaintiff about his absence from the meeting, and Plaintiff explained that he had to

.

take care of his wife. *Id.* at ¶¶ 20-21. Shafer allegedly challenged this as being untrue and stated that Plaintiff had planned to not attend all along. *Id.* at ¶ 22.[2]

On May 2, 2011, Plaintiff says he tried to discuss a seniority issue with Shafer. *Id.* at ¶ 23. Plaintiff opposed Turner's desire to change routes from five 8-hour days to four 10-hour days without posting the routes for bid because Plaintiff believed it disregarded seniority rights and permitted management to treat younger drivers more favorably. *Id.* at ¶¶ 24-25. Shafer responded by allegedly threatening and cursing at Plaintiff. *Id.* at ¶ 26. More specifically, Shafer told Plaintiff to "shut the f\*\*k up, I'm tired of hearing your sh\*t, . . . fifteen years I've been hearing it." *Id.* at ¶ 27. Shafer also challenged Plaintiff to a fight, saying "Go f\*\*k yourself. Let's go down over the hill right now." *Id.* at ¶ 29.

### A. Plaintiff's interaction with the Union regarding Shafer

On May 4, 2011, Plaintiff spoke to Lickert by telephone regarding what he perceived as Shafer's abusive conduct and requested a meeting to discuss Shafer's removal as Union steward. *Id.* at ¶ 31. Plaintiff also asked Lickert if the truck drivers' seniority was being compromised and Lickert told him that it was not. *Id.*

On May 26, 2011, Plaintiff met with Lickert, Shafer, and Union official John Winters. *Id.* at ¶ 32. Lickert minimized Shafer's previous behavior by stating that Shafer had had a "bad day," and that Shafer should not have "lost it" on Plaintiff. *Id.* at ¶¶ 33-34. Plaintiff presented a doctor's note regarding his wife's eye injury in an effort to explain his absence from the previous meeting, but Lickert refused to look at it. *Id.* at ¶¶ 35-36. Shafer also told Plaintiff that "[y]ou should have put your big boy pants on and come talk like a man." *Id.* at ¶ 37. Finally, Plaintiff asked that Shafer be removed as the Union Steward but Lickert said that he would not do this.

---

[2] The TAC does not reveal why Shafter would care about Kovach's whereabouts one way or the other.

*Id.* at ¶ 38. Shafer then continued to verbally abuse Plaintiff on a daily basis, and told Plaintiff that he was not going to stop his abuse and harassment. *Id.* at ¶¶ 39-40.

In a letter dated May 30, 2011, Kovach complained in writing to Lickert about Shafer's abusive and threatening behavior. *Id.* at ¶ 41. Lickert responded by letter dated June 3, 2011 that he would not replace Shafer because Plaintiff "would only start on the new Steward with your same complaints and after a period of time we would be back in this same position." *Id.* at ¶¶ 42-43. Lickert also accused Plaintiff of harassing Shafer. *Id.* at ¶ 42. Lickert stated that if the matter between Kovach and Shafer escalated, that Kovach alone would be responsible as a "grown man." *Id.* at ¶ 44. Plaintiff alleges that at that point felt that further use of the Union's internal grievance procedure would be futile. *Id.* at ¶ 46.

Plaintiff alleges that the Union has retaliated against members who file grievances. *Id.* at ¶ 49. For instance, Bob Janicki, who had filed grievances in 2010, was "called into the office" for the two times he was late and was told by a plant foreman and the then union steward that "[i]f you didn't file grievances, we wouldn't be sitting here right now." *Id.* at ¶ 52. The second time he was "called into the office" for being late the plant foreman told him "[p]eople like you that file grievances should know better than to be late for work." *Id.* at ¶ 53. Moreover, Union stewards are allegedly told by their superiors to not file grievances and are then treated favorably for following these orders. *Id.* at ¶ 54.

Plaintiff also points to incidents involving the Union that occurred nearly two decades ago. In 1993 Plaintiff was allegedly not permitted to speak to and was "personally attacked" by former Union President William Lickert, *Sr.* at a Union meeting. *Id.* at ¶ 47. Plaintiff at that time wrote a letter to Lickert Sr., with a copy to Lickert, Jr., complaining about this mistreatment and setting forth his views on the manner in which the Union conducts its business. *Id.* Plaintiff

also attempted to give his suggestions for contract improvements in writing to Lickert, Sr., through a third party, Mickey Thorn, but Lickert, Sr. took the envelope with Plaintiff's suggestions, tore it up without opening it, stuffed it in an empty soda pop can, and told Thorn, "You can tell him I did that." *Id.* at ¶ 48. Plaintiff does not clearly specify when this latter event took place.[3]

## B. Plaintiff's Interaction with Turner Dairy regarding Shafer

Plaintiff claims to have reported his co-worker Shafer's misconduct to Turner. *Id.* at ¶ 55. Turner Dairy's "Corporate Safety and Health Policy" prohibits fighting and harassment. *Id.* at ¶ 59. On May 13, 2011, Plaintiff met with Turner President Chuck Turner, Jr. and Human Resources Manager Cathy Turner. *Id.* at ¶ 56. President Turner requested that Plaintiff put his concerns in writing and advised him to ignore Shafer. *Id.* at ¶ 57. In a letter dated May 30, 2011, Plaintiff complained about Shafer's conduct and stated that he considered Shafer's conduct to be a "hostile and serious threat towards me." *Id.* at ¶ 58.

Plaintiff met with Turner management again on June 6, 2011 and complained about Shafer's daily verbal abuse. *Id.* at ¶ 60. President Turner told Plaintiff that he could not control how Shafer speaks to Plaintiff, and Cathy Turner stated that discipline for Shafer would not be necessary. *Id.* at ¶ 62.

Despite these complaints to Turner and the Union, Shafer's abuse of Plaintiff continued. *Id.* at ¶ 63. On August 16, 2011, Shafer "drove fast" in his personal truck toward Plaintiff, spewing rock, sand and cinders at him in the Turner parking lot. *Id.* at ¶ 64. On or about

---

[3] The Court recites *these* alleged facts purely to set forth the sweeping temporal scope of Plaintiff's assertions. It is far from obvious that such events, eighteen (18) years before the central events complained of here, have or legally (or logically) could have, much if anything to do with the claims Plaintiff now asserts. Plaintiff reached so deep into the past to include every conceivable issue he has ever had with one or more of the Lickerts that it strikes the Court as being an effort to capture a bridge too far. While it is certainly theoretically possible that the Defendants' recent actions constituted eleven (11) separate intentional violations of five (5) different federal statutes, along with three (3) state law torts, it is also quite possible that the TAC runs the risk of the "wheat" of what may be meritorious claims being obscured by an overwhelming cloud of "chaff."

September 2, 2011, in response to Plaintiff's comment that he could have been seriously injured, Shafer stated, "[i]t's all fun and games until someone loses an eye" (allegedly referencing Plaintiff's wife's eye injury and his failure to support the proposal at the Union meeting in May). *Id.* at ¶¶ 66-67.

On September 15, 2011, Plaintiff met with Turner management to again complain about Shafer's conduct. *Id.* at ¶ 68. Again, Turner management requested that Plaintiff put his complaints in writing and also advised him to avoid Shafer. *Id.* at ¶ 69.

On September 26, 2011, Shafer once again "drove fast" in his personal truck towards Plaintiff in the parking lot, just missing his person and yelling "Nicholas, Nicholas!" *Id.* at ¶ 71. Plaintiff complained of the ongoing abuse by letter dated September 27, 2011, but no one from Turner responded to this letter. *Id.* at ¶¶ 73-74. On October 12, 2011, Plaintiff filled out paperwork to retire because he felt that he no longer could safely work at Turner. *Id.* at ¶ 75.

On October 18, 2011, Plaintiff met again with Turner management and complained of Shafer's ongoing misconduct, including how Shafer drove his truck at Plaintiff. *Id.* at ¶¶ 76-81. When asked if there had been any investigation into his complaints, President Turner indicated that there had been no such investigation and stated "What do you want me to do, twist people's arms?" *Id.* at ¶ 82. On October 20, 2011, President Turner told Plaintiff that he talked to Shafer and thought that Shafer would stop harassing Plaintiff. *Id.* at ¶ 84.

Also on October 20, 2011, Gary Agate, a supervisor at Turner asked why Plaintiff was retiring. *Id.* at ¶ 84. Plaintiff explained that he was retiring because of Shafer's misconduct towards the Plaintiff and Turner's lack of response. *Id.* at ¶¶ 85-90. Agate knew about Plaintiff's situation with Shafer and said that it was "a shame." *Id.* at ¶ 88.

On October 27, 2011 at 4:30 a.m., on the way to work, Shafer drove very closely to Plaintiff's car bumper while flashing his high beams for several hundred yards, then sped up and passed Plaintiff on a double yellow line, and after he pulled in front of Plaintiff Shafer jammed on his brakes a number of times allegedly trying to force Plaintiff into rear-ending his (Shafer's) vehicle. *Id.* at ¶ 91. When they arrived at the Turner facility, Plaintiff confronted Shafer about his driving in front of Lou Palmer, a foreman/supervisor for Turner. *Id.* at ¶ 93. Plaintiff later called Palmer to tell him that he was at his wit's end as a result of Shafer's conduct, Palmer stated "I know and I don't know what to do about the situation either." *Id.* at ¶¶ 94-95. After completing his route and returning to Turner, Plaintiff quit his job. *Id.* at ¶ 96. Plaintiff alleges that "he involuntarily quit his job because of the constant abuse and harassment he suffered from Shafer in violation of work rules and the refusal of both Turner Dairy and Local 205 to prevent further abuse which, under the circumstances, could have resulted in serious bodily injury or death." *Id.*

After Plaintiff separated from his job, Turner Vice President Tim Turner told Plaintiff that he was "sorry" for how things ended for Plaintiff and that he should have called the police regarding the October 27 driving incident. *Id.* at ¶ 97.

## C.   The Rest of the Story

Plaintiff also points to a montage of other seemingly unrelated incidents in the TAC.

First, Plaintiff complained that at varying and undefined times the seniority lists that were posted at work unnecessarily listed each truck driver's date of birth. *Id.* at ¶ 98. These lists supposedly resulted in discussions among employees about when older employees would be retiring. *Id.* at ¶ 99. In response to his complaint about this to Turner management, Plaintiff's birthdate was first listed as "NONE", and then left blank after he complained about the birthday

8

lists again. *Id.* at ¶ 100. Despite his complaints, the list with each driver's birth date (other than his) continued to be used. *Id.* at ¶ 101.

Second, sometime in 2011, Plaintiff's supervisor allegedly asked him when he was going to retire even though Plaintiff had never raised the issue of retirement. *Id.* at ¶¶ 104-05. Plaintiff had also complained to Turner management about being assigned overtime because this was impermissible under the collective bargaining agreement without the driver agreeing to do so. *Id.* at ¶¶ 102-103, 114. In response, his supervisor called him an "old guy" on several occasions and told him to "suck it up." *Id.* at ¶ 103.

Third, Plaintiff also alleges a violation of the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. § 201 *et seq*, alleging[4] that it was common practice for Turner to provide "comp time" or "early leave" to employees in lieu of paying overtime pay, *id.* at ¶¶ 109, 120, that Turner continued this practice because there is no time clock at the company, *id.* at ¶ 110, and that employees who participated in this practice are looked upon "favorably." *Id.* at ¶ 111.[5]

Fourth, Plaintiff points to events involving Tom Bergamasso, a younger Turner truck driver. Bergamasso was allegedly given a preferable four-day route after participating in the practice of not reporting overtime worked. *Id.* at ¶¶ 109-12. Bergamasso completed his route in eight hours even though he was assigned the more favorable four-day ten-hour route, and Plaintiff had been assigned to cover some of Bergamasso's stops. *Id.* at ¶¶ 112-19. When Plaintiff complained about this practice, he was told to "suck it up" and said that "if you can run 500 cases like Tom, I'll let you go home early too." *Id.* at ¶ 117. However, due to vehicular and

---

[4] Without saying when.

[5] Moreover, the collective bargaining agreement states that a driver does not have to work overtime unless he or she agrees to do so. *Id.* at ¶ 113. In 2012, an unidentified employee complained to Turner and the Union because an unidentified union steward failed to report overtime in exchange for getting to go home early. *Id.* at ¶ 120. Plaintiff criticized the practice of employees not reporting overtime worked, the reporting of his own overtime worked was viewed negatively by Turner management, and Plaintiff alleges that he was consequently retaliated against for doing so. *Id.* at ¶¶ 123-26.

pedestrian traffic in the Oakland section of Pittsburgh, where Plaintiff's route was located, running 500 cases "is not plausible." *Id.* at ¶ 118.

Fifth and finally, sometime in the 1990's, Plaintiff had allegedly complained and filed a grievance with Turner Management and the Union when Turner gave a more preferable four, ten-hour route (as opposed to a five, eight-hour day route) to a younger employee without putting the route up for bid. *Id.* at ¶¶ 106-07. This grievance was rejected by Turner management and the Union. *Id.* at ¶ 107.

## III. **DISCUSSION**

### A. **Legal Standard**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This does not require a "heightened fact pleading of specifics" but a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Id.* at 570, 555 (citations omitted). The Third Circuit has laid out a three step process for the Rule 12(b)(6) analysis:

> First, the Court must "take[ ] note of the elements a plaintiff must plead to state a claim." Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a Court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

*Malleus,* 641 F.3d at 563 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 675, 679 (2009)) (internal citations omitted).

The third step of the sequential evaluation requires this Court to consider the specific nature of the claims presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." *See Iqbal,* 556 U.S. at 679. In short, a motion to dismiss should not be granted if a party alleges facts which could, if established at trial, entitle him to relief. *See Fowler v. UPMC Shadyside,* 578 F.3d 203, 213 (3d Cir. 2009).

### B. Count I – 29 U.S.C. § 411 Claims Against the Union

Kovach filed this action against Local Union 205 pursuant to § 102 of the LMRDA, 29 U.S.C. § 412.[6] In his TAC, Plaintiff alleges that he suffered harassment and retaliation as a result of his views and participation relating to "Union-Management issues" contrary to the protection guaranteed to union members by Title I of the LMRDA, in particular 29 U.S.C. §§ 411.

The Union has moved to dismiss this claim, asserting that Plaintiff did not state a claim under 29 U.S.C. § 411 because the actions "do not implicate any formal union activities or procedures." ECF No. 12 at 7. More specifically, it claims that Section 411 relates to the "institution of formal procedures against union members for asserting their rights under the Union Members Bill of Rights, not for situations involving informal discussions between one union member and the officer of a union." *Id.* The Union argues that Plaintiff was not barred from attending or speaking at a Union meeting, and was not disciplined or threatened as a result of speaking at a Union meeting or filing a grievance. *Id.* Alternatively, the Union argues that

---

[6] Subsection 29 U.S.C. § 412 allows union members to sue in federal court when rights guaranteed by the LMRDA have been violated, and provides: "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

the facts allegedly do not show that Shafer was acting on behalf of the Union, and therefore that his actions are not attributable to the Union. *Id.* The Court will first address the Union's attribution defense.

### *1.* *Union Liability*

The Union argues that Shafer's conduct was not attributable to the Union. *Id.* In response, Plaintiff argues that the Union may be liable because he brought suit against Shafer in Shafer's capacity as Union Steward, common law agency principles apply, and that the Union was well aware of Shafer's harassment and failed to take any steps to prevent it. ECF No. 28 at 6.

According to the Third Circuit, "[p]rivate misconduct which incidentally may frustrate appellant's rights as a union member does not give rise to an action under the bill-of-rights section." *Tomko v. Hilbert*, 288 F.2d 625, 629 (3d Cir. 1961). However, it is not "private misconduct" when the action alleged was taken in an official capacity. *Koenig v. Clark*, 536 F. Supp. 753, 763 (D.N.J. 1982) (plaintiff "charges them with taking injurious action against him in their official capacities").

Moreover, unions may be held liable through application of ordinary rules of agency or ratification of the conduct by approval with knowledge. *Aguirre v. Auto. Teamsters*, 633 F.2d 168, 174 (9th Cir. 1980); *Urichuck v. Clark*, 689 F.2d 40, 43 (3d Cir. 1982) ("The actions of union officers are tested by common law theories of agency . . . Thus, if their actions fall within the scope of their authority, they are acting for the union and whatever liability flows from their actions flows to the union also."); *Maier v. Patterson*, 511 F. Supp. 436, 440 (E.D. Pa. 1981) (court found that the lack of internal action by a union against one of its officials alleged to have attacked a union member led to the "suggestion of condonation.").

Viewing the facts in the light most favorable to Plaintiff, it may reasonably be inferred that Shafer was acting on behalf of the Union, and/or that the Union ratified his actions. Central to the resolution of this issue is whether or not Shafer could be found to have been acting within the scope of his Union capacity when the threatening remarks and actions were taken towards Plaintiff. Because the events precipitating Shafer's acts of alleged misconduct included a complaint regarding a Union issue and Shafer's Union leadership role, it is more than plausible to infer that Shafer was acting in his capacity as a Union official when he allegedly bullied, threatened and taunted Plaintiff. Also at issue is whether the Union's subsequent actions (or lack of action) could constitute condonation of this conduct. The alleged failure on the part of the Union to investigate the allegations or to reprimand Shafer, considered in conjunction with the Union officials' statements to the effect of Shafer was "just having a bad day," demonstrates that it is certainly plausible that the Union ratified or condoned Shafer's alleged threatening behavior.

Considering the factual allegations as true, reasonable inferences drawn from the facts alleged would, if proven, place liability squarely on the Union as to Count I. The Court therefore turns to the substance of the LMRDA violation allegation.

### 2. 29 U.S.C. § 411

The LMRDA's "primary objective [is] ensuring that unions [are] democratically governed and responsive to the will of their memberships." *Finnegan v. Leu*, 456 U.S. 431, 436 (1982). A "product of congressional concern with widespread abuses of power by union leadership", *id.* at 435, Congress declared in the LMRDA's preamble that the legislation was "necessary to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives." 29 U.S.C. § 401(c). Furthermore, Congress found that "it is essential that labor organizations, employers,

13

and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations, particularly as they affect labor-management relations." 29 U.S.C.A. § 401(a).

Title I of the LMRDA is referred to as the union members' Bill of Rights, and was adopted as an amendment on the Senate floor by "legislators [who] feared that the bill did not go far enough because it did not provide general protection to union members who spoke out against the union leadership." *United Steelworkers of Am., AFL-CIO-CLC v. Sadlowski*, 457 U.S. 102, 109 (1982). "The amendments placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union." *Finnegan*, 456 U.S. at 435. "'[D]esigned to guarantee every member equal voting rights, rights of free speech and assembly, and a right to sue,' . . . the amendment was 'aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution.'" *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 352 (1989) (quoting *Sadlowski*, 457 U.S. 102, 109; *Finnegan*, 456 U.S. at 435). A plaintiff may seek redress for an infringement of section 411 rights pursuant to section 412.[7]

The Supreme Court in *Lynn* explained that for a section 411 claim to be cognizable, there must first be an interference with or violation of Title I rights. 488 U.S. at 354. However,

---

[7] While neither party raises an issue as to whether the alleged actions attributable to the Union are to be considered "discipline" as considered under § 411(a)(5) or § 609, the Union argues that the allegations "do not implicate any formal union activities or procedures" and that Plaintiff was not "disciplined." ECF No. 12 at 7. However, both "discipline" and "infringement" may be redressed under the LMRDA. *See Finnegan*, 456 U.S. at 439 ("it seems evident that a litigant may maintain an action under § 102-to redress an 'infringement' of 'rights secured' under Title I"); *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991) ("A litigant may successfully seek redress under section 102 for an infringement of these LMRDA rights even if no unlawful 'discipline' is shown.") (quoting *Guidry v. Int'l Union of Operating Eng'rs Local 406*, 907 F.2d 1491, 1493 (5th Cir. 1990)); *Tomko*, 288 F.2d at 628 ("the LMRDA gives to the individual union members certain rights which when interfered with by a union, its officials or its agents, can be redressed civilly against them."); *Murphy v. Int'l Union of Operating Eng'rs, Local 18*, 774 F.2d 114, 122 (6th Cir. 1985) ("a suit may be brought to redress an infringement of section 411 rights even if no improper 'discipline' is shown.").

[t]his is not, of course, the end of the analysis. Whether such interference with Title I rights gives rise to a cause of action under § 102 must be judged by reference to the LMRDA's basic objective: "to ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, periodic elections."

*Id.* (quoting *Finnegan,* 456 U.S. at 441); *see also Conery v. Niccollai,* 34 F. App'x 839, 842-43 (3d Cir. 2002) ("Nevertheless, the Supreme Court has held that a violation of free speech rights by itself is insufficient to violate § 101(a)(2). The infringement on free speech must be viewed with reference to the basic objective the LMRDA.") (citations omitted).

### a.  29 U.S.C. § 411(a)(2) – Free Speech

Count I of Plaintiff's Third Amended Complaint references both 29 U.S.C. § 411(a)(1) and § 411(a)(2). TAC at ¶ 133. Subsection 411(a)(2), which is also § 101(a)(2) of the LMRDA, guarantees a union member the right of free speech and assembly, subject to the reasonable rules of the union. It reads:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).

Section 411(a)(2) demonstrates that Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Lynn,* 488 U.S. at 355 (quoting *Sadlowski,* 457 U.S. at 112). The subject matter of any protected speech must "directly relate" to the union-member relationship. *Semancik v. United Mine Workers of Am. Dist. No. 5,* 466 F.2d 144, 154 (3d Cir. 1972); *Hylla v.*

*Transp. Commc'n Int'l Union*, 536 F.3d 911, 917-18 (8th Cir. 2008) (the scope of protected speech is limited to speech relating to the labor organization).[8]

In his TAC, Plaintiff alleges that he opposed a proposal which was favored by top Union leadership that allegedly diminished certain seniority rights, TAC at ¶ 14, voiced an opinion regarding a seniority issue, *id.* at ¶ 23, and spoke with Union leaders to discuss Shafer's misconduct and potential removal as Union Steward. *Id.* at ¶¶ 38, 41. Seniority issues that are in the process of being voted on by the Union and criticism regarding Union leadership, here the Union Steward, directly relate to Union issues. *See Semancik*, 466 F.2d at 153 ("whenever a union member is to be disciplined for discussing the fitness of union leaders, their policies or their administration, he may claim the protection of the LMRDA's Bill of Rights.") (citing *Giordani v. Upholsterers Int'l Union*, 403 F.2d 85, 89 (2d Cir. 1968)).

After Plaintiff failed to attend the Union meeting in which the Union membership voted on the new proposal, Shafer confronted Plaintiff about his absence in an allegedly critical fashion. TAC at ¶ 22. After Plaintiff tried to discuss a seniority issue with Shafer, Shafer told him to "shut the f**k up, I'm tired of hearing your sh*t", and challenging him to a fist fight. *Id.* at ¶¶ 27, 29. After Plaintiff met with Union leadership to report Shafer's actions, Shafer told him that "[y]ou should have put your big boy pants on and come talk like a man." *Id.* at ¶ 37. Throughout this timeframe, Plaintiff alleges that Shafer continued to verbally abuse and physically endanger Plaintiff, including Shafer's driving at Plaintiff with his truck on several occasions. *Id.* at ¶¶ 39-40, 64, 71, 91.

---

[8] Other Circuits have articulated a three-step analysis when evaluating an alleged § 411(a)(2) violation. To establish a prima facie case for a violation of § 411(a)(2), "a union member must allege facts showing: (1) he or she exercised the right to oppose union policies; (2) he or she was subjected to retaliatory action; and (3) the retaliatory action was 'a direct result of his [or her] decision to express disagreement' with the union's leadership." *Casumpang v. Int'l Longshoremen's & Warehousemen's Union, Local 142*, 269 F.3d 1042, 1058 (9th Cir. 2001) (quoting *Lynn*, 488 U.S. at 354); *see also Marshall v. Local 701 Int'l Broth. of Elec. Workers*, 387 F. App'x 623, 627 (7th Cir. 2010). *Cf. Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1469 (6th Cir.1992).

Given this factual background and considering the proximity in the timing of the events, the Court is unable to say at this stage that Shafer's conduct towards the Plaintiff was in all respects unrelated to the Plaintiff's opinions regarding Union matters and was not an attempt to interfere with the protected rights of the Plaintiff. It is more than plausible that the conduct and harassment by Shafer, if proven, was indeed a very direct reprisal for Plaintiff's criticism of Union policy and Shafer's leadership as Union Steward. Intimidation and impeding speech would naturally discourage members from invoking their legal rights under federal labor law, and is wholly antithetical to the protection of the LMRDA. *See Maier*, 511 F.Supp. at 441 ("The assault could be interpreted as having the purpose of attempting to chill the right of free speech of those members, including [Plaintiff], to press their grievance concerns or to complain of [the union trustee's] representation of them."); *Ruocchio v. United Transp. Union, Local 60*, 181 F.3d 376, 387 (3d Cir. 1999) (courts must entertain "union exercise of power that chills speech protected by the LMRDA."). Therefore, this Court finds that there is a plausible inference to be drawn that Plaintiff's statutorily-protected free speech rights were violated.

The Union argues, however, that Plaintiff's actions are not protected activities under the LMRDA because no formal Union procedures were implicated, such as speaking at a Union meeting or being formally disciplined by the Union.[9] ECF No. 12 at 7. Considering the language of the LMRDA, its purpose and the "evils it was meant to cure," *Tomko*, 288 F.2d at 626, and other courts' decisions, this Court is unable to say that Plaintiff's alleged actions could not be found to be protected activity.

The Court first looks to the language of the statute. *See Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 372 (1986) (the plain language of a statute

---

[9] While Plaintiff does not allege that he was formally disciplined by the Union nor was he retaliated against for speaking at a Union meeting, he did invoke internal Union procedures by meeting with Union leadership to express his grievances and by filing a written complaint with the Union. TAC at ¶¶ 32, 41.

is important, and often the best, evidence of its meaning); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) (same). Subsection 411(a)(2) states that every Union member has the right "to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting." While the language after the second semicolon is qualified so that the protected right is to "express at meetings," the language before the semicolon does not contain such a restrictive phrase. The Court is not inclined to read a limitation into this part of the statute without appropriate authority to do so. *See Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 374-75 (3d Cir. 2012).

Moreover, the Third Circuit has articulated a general rule that under the LMRDA, "the members' right of free speech is given an expansive protection." *Mallick v. Int'l Broth. of Elec. Workers*, 644 F.2d 228, 235 (3d Cir. 1981); *Ruocchio*, 181 F.3d at 386 ("'expansive protection' [is] given to union members' speech rights."); *Rodriguez v. Serv. Employees Int'l*, 755 F. Supp. 2d 1033, 1046 (N.D. Cal. 2010) ("§ 411(a)(2) has been construed broadly 'to provide a remedy not only for direct reprisals against dissenters, but also for union conduct that inhibits or threatens dissenting speech.'") (quoting *Ackley v. W. Conference of Teamsters*, 958 F.2d 1463, 1475 (9th Cir. 1992)). Consequently, the limiting interpretation of the statute urged by the Union Defendants would be inappropriate.

While the Union cites to cases which involve formal disciplinary actions brought by a union, they fail to cite any cases which hold that activity outside of the scope of formal procedures by a union is never protected activity. Furthermore, prior court decisions have held that a myriad of less traditional methods of infringing free speech rights are actionable. *See Maier*, 511 F. Supp. at 446 (where union members met with union trustee to complain about

18

employer and trustee's failure to protect their interests, and, in response, trustee pushed a member's head through a glass window, "[a]n assault and battery by a union representative upon a union member engaged in expression of views on a subject cognizable within the business of the union does provide the basis for a proper claim under 29 U.S.C. §§ 411(a)(1)–(2), 412.") (citations omitted); *Wiglesworth v. Chauffeurs, Teamsters & Helpers Local Union 771*, No. 84-4996, 1985 WL 3230, at *9-10 (E.D. Pa. Oct. 22, 1985) (speech threatening violence actionable under § 411); *Murphy v. Int'l Union of Operating Eng'rs, Local 18*, 774 F.2d 114, 123, 125 (6th Cir. 1985) (economic discrimination, intimidation, and physical violence by the union is actionable under § 411 even if Plaintiff failed to prove that he was denied his right to speak at union meetings).

The Supreme Court explained that Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Sadlowski*, 457 U.S. at 112. A violation of LMRDA Title I rights can take many forms. Moreover, even though Plaintiff does not allege that he was barred from attending Union meetings or that he was formally disciplined, other courts have stated that "[i]t is absurd to require that a union *succeed* in an attempt to intimidate dissidents before a section 411 violation is established." *Murphy*, 774 F.2d at 126; *Maier*, 511 F. Supp. at 446 ("impeding the exercise of Title I substantive rights by intimidation . . . was actionable as a violation of the substantive right.").

Plaintiff alleges that he faced direct physical intimidation, verbal abuse, and other harassment in retaliation for his speech as a member of the Union. Plaintiff claims that a long-time Union official tried to run him off of the road and to beat him up because of Plaintiff's position on important Union matters. Such actions would violate the substantive provisions of

19

§ 411(a)(2), and the allegations here are more than sufficient to state a claim for relief under that statutory provision. Therefore, the Union's Motion to Dismiss the §411(a)(2) claims asserted in Count I of the TAC is denied.

**b.    29 U.S.C. § 411(a)(1) – Equal Rights**

Under 29 U.S.C. § 411(a)(1), also known as §101(a)(1) of the LMRDA, every union member has "equal rights and privileges" of participation in the internal affairs of the union subject to reasonable Union rules. That section provides:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1).

"The United States Supreme Court has determined that the provisions of § 101(a)(1) are narrow in scope." *Conery v. Niccollai*, 34 F. App'x 839, 842 (3d Cir. 2002) (citing *Calhoon v. Harvey*, 379 U.S. 134, 138–39 (1964)). The *Calhoon* Court explained that § 411(a)(1) is "no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." 379 U.S. at 139 (district court lacked jurisdiction to hear § 411(a)(1) claim because "the complaining union members . . . have not been discriminated against in any way and have been denied no privilege or right to vote or nominate which the union has granted to others"). This section, however, includes "much more than the 'mere naked right to cast a ballot.'" *Cupid v. Local 116 of Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*, No. 91-1809, 1993 WL 21794, at *7 (E.D. Pa. Jan. 27, 1993) (section also protects the opportunity to mount effective support or opposition to the leadership's position) (quoting *Bauman v. Presser*, No. 84-2699, 1984 WL 3255, at *7 (D.D.C. Sept. 19, 1984)).

Section 411(a)(1) "is an anti-discrimination provision, pure and simple." *Ackley*, 958 F.2d at 1473. Consequently, to state a claim, a union member must allege a denial of rights that are accorded to other members. *Calhoon*, 379 U.S. at 138-39; *Conery v. Niccollai*, No. 92-840 (JAG), 1998 WL 34062199, at *5 (D.N.J. Mar. 31, 1998) (a "cause of action by a union member cannot be sustained under § 101 without some claim of discrimination and some demonstration that the plaintiff has been denied the right to vote."); *Keck v. Emp. Indep. Ass'n.*, 387 F. Supp. 241, 247 (E.D. Pa. 1974) (no cause of action under § 411(a)(1) where plaintiffs failed to allege that members or classes were discriminated against with respect to their right to vote in elections or referendums); *Lodge 1380, Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps. (BRAC) v. Dennis*, 625 F.2d 819, 826 (9th Cir. 1980) ("we have concluded that '(j)urisdiction under section 101((a)(1)) exists only when such discrimination has been alleged.'") (citation omitted).

Plaintiff alleged that he gave Shafer his signed, written vote for the May 1, 2011 Union ratification meeting. TAC at ¶¶ 14-15. However, Plaintiff does not allege that his vote was not accepted nor cast. While Plaintiff took a position contrary to the Union on a proposal, he does not allege that he was refused the opportunity to persuade other Union members. *See Bauman v. Presser*, No. 84-2699, 1984 WL 3255, at *7 (D.D.C. Sept. 19, 1984) ("members must have the opportunity to attempt to persuade their fellow members to reject or support a proposal."); *Gilliam v. Indep. Steelworkers Union*, 572 F. Supp. 168, 171-72 (N.D. W.Va. 1983) (members must be able to "mount effective support or opposition to the leadership's position."). Plaintiff asserts that many years ago, he had tried to transmit suggestions for contract improvements through a third party, but *former* Union President Lickert, *Sr.* tore up the written suggestions and said "You can tell him I did that." TAC at ¶ 48. Plaintiff fails to allege that in any recent

21

timeframe, other Union members were able to vote or make suggestions through a third party but he was not.

Read in a light most favorable to Plaintiff and also through the lens of plausibility, the TAC does not allege that Plaintiff was discriminated against in his right to nominate or vote for candidates or issues. Plaintiff fails to allege how the events he recounts interfered with his right to vote or nominate candidates, or the democratic governance of the Union. Moreover, he does not allege that the Union allowed other members to take these actions when he was not permitted to do so, in violation of equal rights. For these reasons, the Union's Motion to Dismiss with regard to the § 411(a)(1) claims of Count I will be granted.

### B. Count II – 29 U.S.C. § 501 Claims as to Lickert & Shafer

In Count II, Plaintiff alleges that Lickert, Jr. and Shafer acted in violation of their fiduciary duty under 29 U.S.C. § 501. They argue, similar to the Union's argument as to Count I, that there could be no violation because "none of the Plaintiff's issues were ever raised in the context of a formal meeting." ECF No. 12 at 5. This argument misses the mark.

The Third Circuit has held that the fiduciary duty of union officers under § 501[10] is broad in scope, *Sabolsky v. Budzanski*, 457 F.2d 1245, 1250 (3d Cir. 1972), and includes an obligation to protect the political rights of its members. *Semancik*, 466 F.2d at 155.

29 U.S.C. § 501(b) provides that when any Union officer has violated his duties as proscribed in section 501(a), the aggrieved member must first 'request' that the union or its officers "sue or recover damages or secure an accounting or other appropriate relief." If the union fails to file suit, the aggrieved member may then sue after establishing "good cause." *See*

---

[10] 29 U.S.C. § 501(a), with respect to the fiduciary duties of officers, states in pertinent part: "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. . . . " While the thrust of the statutory language is financial, the Third Circuit has held, as referenced above, that officers have the duty to insure the political rights of all members of their organization. *O'Rourke v. Crosley*, 847 F. Supp. 1208, 1221 (D.N.J. 1994).

*Sabolsky*, 457 F.2d at 1250 ("[T]he allegations of the verified complaint may be sufficient to enable the court to determine whether there is 'good cause.'") (quoting *Horner v. Ferron*, 362 F.2d 224, 228 (9th Cir. 1966)). "Under *Sabolsky*, 'good cause' is established if plaintiff alleges a breach of the duty imposed by § 501(a), if plaintiff has sought internal relief (exhaustion of internal remedies is not required), and if the suit is not merely vexatious." *Wiglesworth*, 1985 WL 3230, at *11.

In his TAC, Plaintiff alleges that Shafer infringed his political rights through harassment and intimidation, that Lickert, Jr. was made aware of Shafer's brazen misconduct and then failed to take any action, and, as a result, both of these Defendants breached their § 501 fiduciary duties as an officer and agent of the Union. TAC at ¶¶ 142-52. In *O'Rourke v. Crosley*, 847 F. Supp. 1208, 1221 (D.N.J. 1994), the court denied a motion to dismiss where the plaintiff alleged that an agent of the union directly violated his political rights and that another union officer "knew of the harassment suffered by plaintiff, and yet did nothing to remedy the situation." *Id.* at 1221.

While Shafer and Lickert, Jr. argue that there could be no statutory violation because Plaintiff did not act within a formal Union membership meeting[11], as addressed above as to Count I, they fail to cite to any case law that limits protected activity to that which occurs in a formal Union membership meeting. Moreover, the Third Circuit has directed that § 501 "should receive a broad and liberal interpretation and application." *Sabolsky*, 457 F.2d at 1250-51 (quoting *Johnson v. Nelson*, 325 F.2d 646, 650 (8th Cir. 1963)). After delving into the section's legislative history, the *Sabolsky* court explained that "Senate Bill 1555 was amended by H.R. 8342 and, as finally enacted, 'extends the fiduciary principle to *all of the activities* of Union

---

[11] Contrary to this position, Plaintiff does allege that he raised his grievances concerning Shafer in a meeting with Union leaders, including Lickert, Shafer, and John Winters. TAC at ¶ 32.

Officials and other Union Agents or representatives.'" *Id.* at 1250 (emphasis added). Plaintiff has adequately alleged a breach of fiduciary duties imposed by § 501 on Lickert and Shafer.

Plaintiff's TAC is also sufficient to meet the "request" requirement. Plaintiff sought internal Union relief by meeting with Union leaders and writing a formal complaint to express his grievances and request Shafer's removal as Union Steward. TAC at ¶¶ 32-38, 41. After the Union failed to address Plaintiff's concerns and he was told by Lickert that he alone was responsible as a "grown man" to resolve matters, Plaintiff reasonably believed that further use of the Union's internal procedures would be futile. *Id.* at ¶¶ 39-41, 44, 46. *Sabolsky* holds that pure "exhaustion" of internal remedies is not necessary and emphasized that the "request" requirement standard presents a low bar, pointing to *Aho v. Bintz*, 290 F. Supp. 577 (D. Minn. 1968), "where the plaintiffs' allegation that they telephoned the International President for relief, which was denied by return wire, was deemed sufficient." 457 F.2d at 1252-53; *see also O'Rourke*, 847 F.Supp. at 1219 (noting that the *Sabolsky* court did not adopt a restrictive standard and that futility may serve as an exception to the "request" requirement).

Finally, a review of Plaintiff's claimed efforts paints a portrait of attempts to seek a remedy for the very misconduct that the LMRDA was created to prevent. The TAC is therefore sufficient to establish the requisite "good cause", and thus Defendants Lickert and Shafer's Motion to Dismiss Count II is denied.

### C. Count V – Negligent Supervision & Retention Claims Against Turner

An employer owes a duty "to exercise reasonable care in selecting, supervising and controlling employees." *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 697 (Pa. Super. Ct. 2000).[12] The Pennsylvania Supreme Court has held that, "[t]o fasten liability on an

---

[12] The Court may exercise supplemental jurisdiction over Plaintiff's state law claims as they arise out of the same transaction or occurrence as the federal claims. 28 U.S.C. § 1367. Furthermore, "[t]he Court must apply

employer[,] . . . it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of his employee." *Dempsey v. Walso Bureau, Inc.,* 246 A.2d 418, 422 (Pa. 1968).

Once Plaintiff notified Turner's management of Shafer's alleged harassment and physically abusive behavior towards Plaintiff, Turner was put on notice of Shafer's potential inclination towards violent behavior targeting Plaintiff, and could therefore be liable for the foreseeable future misconduct of that employee. *See Hutchison ex rel. Hutchison v. Luddy,* 742 A.2d 1052, 1057-58 (Pa. 1999). However, Turner moves to dismiss this Count on the grounds that this claim is barred by the exclusivity provisions of the Pennsylvania Workers' Compensation Act ("WCA"), 77 P.S. §1 *et seq.,* and that it does not fall within the "personal animus", also known as the "third party attack", exception to overcome the exclusivity of the WCA. ECF No. 21 at 6-8; ECF No. 29 at 2-3. Turner argues that to fall within that exception the employee must allege that he was injured by a coworker for *purely* personal reasons. ECF No. 21 at 6; ECF No. 29 at 2.

Under the WCA:

an employee's common law right to damages for injuries suffered in the course of his employment as a result of his employer's negligence is completely surrendered in exchange for the exclusive statutory right of the employee to compensation for all such injuries, regardless of negligence, and the employer's liability as a tortfeasor under the law of negligence for injuries to his employee is abrogated.

*Socha v. Metz,* 123 A.2d 837, 839 (Pa. 1956).[13]

---

Pennsylvania state law to Plaintiff's common law tort claims through the exercise of its supplemental jurisdiction." *Cahill ex rel. Cahill v. Live Nation,* 866 F. Supp. 2d 503, 513 (W.D. Pa. 2011) (citing *Wisconsin Dept. of Corrections v. Schacht,* 524 U.S. 381 (1998)). Both Turner and Plaintiff cite to Pennsylvania state law in their briefs, thus the choice of law is not at issue in this case.

[13] See also 77 P.S. § 481(a), which states in pertinent part: "The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes . . . ."

The exclusivity provisions of the WCA contain certain exceptions, including the "personal animus", or "third party attack", exception. *Krasevic v. Goodwill Indus. of Cent. Pa., Inc.*, 764 A.2d 561, 565 (Pa. Super. Ct. 2000). The "Act provides that the term *injury arising in the course of his employment,* 'shall not include an injury caused by an act of a third person intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment. . . . '" *Kohler v. McCrory Stores*, 615 A.2d 27, 30 (Pa. 1992) (quoting 77 P.S. § 411(1)); *Abbott v. Anchor Glass Container Corp.*, 758 A.2d 1219, 1223-24 (Pa. Super. Ct. 2000). *Kohler* explained that "the scope of such exclusivity does not preclude damage recoveries by an employee, based upon employer negligence in maintaining a safe workplace, if such negligence is associated with injuries inflicted by a co-worker for purely personal reasons." *Id.* at 30. Therefore, "in order to set forth a valid cause of action against an employer, an employee must assert that his injuries are *not* work-related because he was injured by a co-worker for purely personal reasons." *Id.* at 31.

Courts have explained that "[w]here the animosity between the third party and the injured employee is developed because of work-related disputes, the animosity is developed *because of the employment*." *Hammerstein v. Lindsay*, 655 A.2d 597, 601 (Pa. Super. Ct. 1995). A "lack of pre-existing animosity between the combatants strongly suggests that the motive for the attack was work-related and not because of reasons personal to the assailant." *Mike v. Borough of Aliquippa,* 421 A.2d 251, 255 (Pa. Super. Ct. 1980). Moreover, "[i]f the third party would have attacked a different person in the same position as the injured employee, the attack falls outside the [] exception." *Hershey v. Ninety-Five Assoc.*, 604 A.2d 1068, 1072 (Pa. Super. Ct. 1992). Finally, "[t]here is a rebuttable presumption that an injury is work-related where it occurs on the employer's premises." *Kohler*, 615 A.2d at 30.

In *Hammerstein*, the court held that plaintiff's allegations did not fall into the personal animus exception where "[t]here has been no indication that there were personal reasons for Dr. Lindsay's conduct, or that there was any pre-existing animosity between [plaintiff] and Dr. Lindsay." 655 A.2d 597, 602 (Pa. Super. Ct. 1995). *Cf. Brooks v. Marriott Corp.*, 522 A.2d 618, 621 (Pa. Super. Ct. 1987) (overruled on other grounds) (allegations that employee was killed because killer had personal animus against her and that this animus was the motivation for the murder were sufficient to state a cause of action within the personal animus exception).

Plaintiff alleges that "Shafer acted in whole or in part to injure Plaintiff because of reasons personal to him, and not directed against him as an employee or because of his employment." TAC at ¶ 177. Plaintiff also alleges that Shafer's reactions to him "reflect[ed] a pre-existing personal animosity towards Kovach." *Id.* at ¶ 178.[14] Consequently, the viability of this Count turns on Shafer's motivation, an inherently factual determination.[15]

Moreover, Plaintiff alleges that Turner had knowledge that Shafer had been harassing Plaintiff, that Turner knew or should have known that harm may result from this misconduct, and that Turner failed to take appropriate action. *Id.* at ¶¶ 172-76. Finally, Plaintiff alleges that Shafer "had pre-existing animosity towards Kovach for ten years prior to him becoming steward," *id.* at ¶ 28, and that some of the harassment occurred outside of work hours and work premises. *Id.* at ¶ 179.

Disposition of the Motion as to this Count is a close call. Pennsylvania law makes it plain that Plaintiff's injury must be *either* work-related or for *purely* personal reasons; it cannot be both. *See Kohler*, 615 A.2d at 32. Consequently, Turner argues that Plaintiff's claim must be

---

[14] For instance, when Plaintiff spoke to Shafer regarding a seniority issue, Shafer responding by telling Plaintiff to "shut the f**k up, I'm tired of hearing your sh*t, . . . fifteen years I've been hearing it." TAC at ¶¶ 23, 27.

[15] One not made any simpler by Plaintiff's use of the phrase "in whole or in part" in the context of a legal test that demands purity as to motivation.

dismissed because all of the other sections of his TAC allege that Shafer's conduct was work-related. ECF No. 21 at 6; ECF No. 29 at 2-3. Plaintiff admittedly pleads in the alternative in this regard, ECF No. 26 at 8, which is permissible under Fed. R. Civ. P. 8(d)(2)-(3).[16]

Viewing these allegations and all inferences fairly deducible therefrom as true, the Court concludes that Plaintiff has (barely) sufficiently set forth an alternative cause of action within the "personal animus" exception under the WCA. Given the nearly thirty (30) dozen paragraphs of pleading in which Plaintiff claims that all the Defendants were out to get him because of workplace issues, Plaintiff may find it quite difficult to prove at trial (or to survive a summary judgment motion on the issue) that Shafer's actions towards him did not arise *at all* out of work-related incidents, and that the claimed harassment was *purely* personal in nature. However, at this point the Court concludes that they are sufficiently pled alternatively to withstand Turner's Motion to Dismiss Count V, subject to resurrection at the summary judgment stage, post-discovery.

### D. Count VII – Labor Management Relations Act Claims Against Turner and the Union

Count VII of the TAC alleges that Turner violated the provisions of the collective bargaining agreement ("CBA") between it and the Union by not providing a safe workplace for Kovach, and by discriminating against him for engaging in lawful work-related and Union-related activity. It also claims that the Union breached its duty of fair representation owed to him. It is in essence a claim by an individual employee that his employer breached the labor agreement as to which the employee (Kovach) is an intended third-party beneficiary. Plaintiff

---

[16] Fed. R. Civ. P. 8(d)(2)-(3) reads: "(2) *Alternative Statements of a Claim or Defense.* A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
(3) *Inconsistent Claims or Defenses.* A party may state as many separate claims or defenses as it has, regardless of consistency."

cites to no specific provisions of the CBA that have been breached. Instead, he either incorporates, or recites, a litany of events of abusive conduct toward him by the Union and its leaders, and Turner's failure to protect him from that activity.

For decades, it has been settled law that an individual Union-represented employee, covered by a CBA, cannot bring a federal lawsuit under 29 U.S.C. §185 alleging a breach of a CBA unless they have first fully exhausted any available grievance procedure under the CBA itself, reflecting a Congressional policy strongly favoring the informal resolution of such claims at the lowest level, in the swiftest way. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965); *DelCostello v. Int'l Broth. of Teamsters*, 462 U.S. 151, 163 (1983). Given that the Union usually controls access to at least the final stages of such an intra-contractual dispute resolution process, a safety valve exists. That is, if the employee can demonstrate that his recourse to such a procedure would be wholly futile and fruitless, or that the Union has breached its duty of fair representation toward the employee, then the employee can come straight to federal court. *Clayton v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am.*, 451 U.S. 679, 689 (1981); *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005). The latter standard is a high one, in that it is not enough to allege that the Union was negligent or inept in its actions, but instead, it must be shown that the Union's actions were discriminatory and arbitrary, e.g. essentially driven by animus directed at the employee.[17] *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir. 1993).

Here, Kovach alleges that he is excused from the required initial recourse to the intra-CBA processes because of the laundry list of profoundly bad conduct toward him by Shafer and

---

[17] The claim that a Union has breached it duty of fair representation is not a "stand alone" claim for affirmative relief, but if proven excuses the employee's compliance with a CBA's grievance and arbitration procedure, allowing direct access to a federal court for a breach of labor contract claim against the employer and the Union actionable pursuant to 29 U.S.C. §185 (commonly referred to as a "Section 301 claim," referencing the applicable section of the LMRA). *DelCostello*, 462 U.S. at 162-65.

Lickert Jr. constituting a breach of the Union's fair representation duty, and that given his gross mistreatment at their hands, any effort on his part to utilize those processes would have been both fruitless and pointless.

Assuming for the sake of discussion that his allegations in those regards are at least plausible, the remaining problem is that the allegations of Count VII, despite being part of a *Third* Amended Complaint, simply do not allege a breach of contract in the first instance. There is no specific reference to any provisions of the CBA that are enforceable as contractual obligations by Kovach or anyone else. While the factual allegations of this Count of the TAC surely do repeat in detail the various and sundry allegations of serious misconduct on the part of Shafer and Lickert, they do nothing to connect up those allegations (which are at the core of the allegations of the TAC) and a breach of any enforceable provision of the CBA by Turner. Thus, after four (4) pleading tries, this Count simply does not meet the basic plausibility pleading standard necessary for the assertion of such a breach of contract claim in this Court, and it is therefore dismissed with prejudice.[18]

### E. Count VIII – Retaliation under Fair Labor Standards Act v. Turner

The Fair Labor Standards Act of 1938 ("FLSA") sets forth employment rules concerning minimum wages, maximum hours, and overtime pay. 29 U.S.C. § 201 *et seq*. The Act contains an anti-retaliation provision that forbids employers:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the Act], or has testified or is about to testify in such proceeding, or has served or is about to serve on an industry committee.

---

[18] On top of this is the reality that Kovach's one perhaps plausible Section 301 claim appears to arrive in this Court far too late. *DelCostello* announced a six-month statute of limitations for such claims. 462 U.S. at 172. According to the TAC, Kovach plainly knew of his claims for both a contractual breach relative to the route schedule issue and the Union's breach of its duty to him either back in "the 1990's", TAC at ¶ 106, or more charitably, on May 2, 2011, TAC at ¶ 208, on June 3, 2011, TAC at ¶ 220, when Lickert, Jr. and Shafer made it plain that they would do nothing to pursue those claims. This action was filed on April 4, 2012, ten (10) months after the last of those dates. Thus, such claims would be barred by the applicable statute of limitations.

29 U.S.C. § 215(a)(3).

In order to establish a *prima facie* case of discriminatory retaliation, "a plaintiff must show that (1) the plaintiff engaged in protected activity, (2) the employer took an adverse employment action against [him], and (3) there was a causal link between the plaintiff's protected action and the employer's adverse action." *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 939 (3d Cir. 2003); *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007); *Shakib v. Back Bay Rest. Grp., Inc.*, No. 10CV4564, 2011 WL 4594654, at *7 (D.N.J. Sept. 30, 2011).

Plaintiff's allegations in Count VIII are conclusory, and are insufficient to get past even a most lenient application of the *Twiqbal* standard.[19]  Plaintiff asserts that he "complained of this practice to, inter alia, his supervisor Gary Agate, Jim Turner (former President), and Walt Turner (owner/manager)" and "complained internally to Turner Dairy about its practice of having employees trade 'comp' time (or early leave) to employees in exchange for overtime worked, and treating more favorably those employees who participated in this practice and less favorably those employees like Kovach who rejected the practice and actually recorded his or her overtime." *Id.* at ¶¶ 124, 253. However, Plaintiff does not articulate any sort of time frame or specify the substance of these complaints, does not set forth sufficient facts to allege that they complained about conduct violative of the FLSA, all of which precludes establishing a

---

[19] *Twiqbal* refers to the *Twombly/Iqbal* standard. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *RHJ Med. Ctr., Inc. v. City of DuBois*, 754 F. Supp. 2d 723, 730–31 (W.D. Pa. 2010)).

reasonable inference that they were timely made, provided sufficient fair notice, or even that they could be fairly claimed to be regarding an FLSA violation.[20]

Plaintiff fails to allege facts that would allow a reasonable inference that he engaged in protected activity under the FLSA and that he did so within the statute of limitations. 29 U.S.C. § 255. Moreover, Plaintiff fails to articulate facts that would allow a plausible inference as to how an adverse employment action and Turner's supposed retaliation was connected to any FLSA protected activity, especially in the context of his very direct and prolix assertions in hundreds of paragraphs that Plaintiff was forced to quit his job not because of FLSA-related issues, but because of Shafer's threats and conduct.[21] Moreover, his conclusory allegations appear to have nothing to do with the central allegations of the TAC,[22] and are wholly detached from Plaintiff's core claims that he quit his job because of Shafer's actions relative to the ratification of a deal between the Union and Turner regarding shift schedules, and Lickert Jr.'s and Turner's

---

[20] For instance, giving "comp time" within the same workweek is not an FLSA violation at all when it brings the hours worked in that workweek to 40 hours or less. Thus, invoking the phrase "comp time" in talismanic fashion does not set out an FLSA violation, or a claim of one, without much more.

[21] For instance, in an effort to establish the causal link between his protected activity and the employer's adverse action, Plaintiff simply alleges "[a]s a result of Kovach's reporting of overtime and internal complaints of the common practice of trading 'comp' time for overtime worked, Kovach suffered retaliation by both Turner Dairy and Local 205 who failed to adequately protect him from Shafer which resulted in Kovach's constructive discharge," TAC at ¶ 126, and "[a] causal connection exists between Kovach's protected activity and Turner Dairy's actions and omissions based on the temporal proximity between the protected activity and constructive discharge series of events as well as the antagonism against Kovach following the protected activity." *Id.* at ¶ 261. These statements are little more than conclusory incantations and are insufficient to meet the *Twiqbal* standard.

[22] This is especially so as to his FLSA and ADEA claims, given that Plaintiff quit his job. Therefore, to convert that resignation into an actionable FLSA or ADEA claim, Plaintiff must demonstrate that he was constructively discharged, either in retaliation for FLSA-protected actions, or because of his age. To make that claim, he needs to demonstrate that his employer (Turner) knowingly permitted unlawful working conditions (FLSA-based retaliation or age discrimination) that were so objectively intolerable that any reasonable person subjected to them would resign. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013); *Stremple v. Nicholson*, 289 Fed. App'x 571 (3d Cir. 2008). The employer's actions must be severe and pervasive, *Reynolds v. Dept. of the Army*, 439 Fed. App'x 150, 154 (3d Cir. 2011), and the employer's conduct must render further employment intolerable. *Iovanella v. Genetech, Inc.*, 452 Fed. App'x 85, 88 (3d Cir. 2011). Importantly, the intolerable conditions must relate to the specific alleged statutory violation. *Brown v. Kessler Inst. for Rehab.*, No. 11-1758, 2012 WL 5839203, at *1 (3d Cir. 2012). While Kovach may have been subjected to profoundly bad conduct on the part of Shafer, and the Union, his TAC falls far short of plausibly showing that Turner subjected him to objectively severe and pervasive intolerable working conditions because of either FLSA-protected activity, or because of his age.

condonation of them. Consequently, Defendant's Motion to Dismiss Count VIII is granted. Given that Plaintiff has now filed three (3) amended Complaints, the Court finds no basis to grant further leave to amend in these regards, and this dismissal is with prejudice.

### F. Counts IX, X, & XI – ADEA claims against Turner & the Union

Counts IX, X and XI seek to allege various claims under the ADEA. TAC at ¶¶ 264-313. While the *Twiqbal* bar is not a high one, it is nonetheless a bar to be surmounted. The allegations of these Counts of the Complaint do not get over it, and they will be dismissed.

The heart of Kovach's TAC centers on the profoundly bad treatment that he claims he was subjected to at the hands of his Union and its officials. Now, in these latter counts of the TAC, Kovach switches gears completely and instead claims that his victimization was not rooted in his activities within the Union, or in his opposition to the conduct of the Union, but instead was founded on his age.[23] While pleading in the alternative is certainly permitted by the Federal Civil Rules,[24] what is pled alternatively must still have a plausible basis grounded in fact. *Iqbal*, 556 U.S. at 663 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Kovach's TAC in these regards is instead a litany of random purported connections between the fact of his age, and what he viewed as generally harmful treatment by Turner in a wide array of disparate settings over many, many years. A close examination of the allegations of his TAC at these Counts reveals a fundamental conflation of the concept of correlation with causation.

The common thread of each of these Counts is that supposedly due to his age, Kovach was treated in a less favorable fashion than other employees by both the Union and Turner. The

---

[23] Given the Supreme Court's holding in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176-77 (2009), to prevail Kovach would have to prove that his age was the "but for" cause of his problems.

[24] *See, supra*, Fed. R. Civ. P. 8(d)(2)-(3).

33

reality of the pleading, however, is that it simply lays out a series of facially disjointed events, ranging from events allegedly occurring up to twenty years ago, "in the 1990's," TAC at ¶ 277, to somewhat random events such as isolated allegedly ageist comments made at undefined times in unstated contexts, *id.* at ¶¶ 103-05, to Turner listing his date of birth as "NONE" on a seniority list and then leaving a blank line when he requested the posted list be removed, *id.* at ¶¶ 100, 272, to a supposedly younger driver treated "more favorably" in an undefined way at an undefined time, *id.* at ¶¶ 112, 116, 119, 280-81, to Kovach's grievances being denied, *id.* at ¶¶ 38, 42-44, 82, 107,[25] to Shafer being treated more favorably because he was not disciplined in the manner Kovach believed he should have been. *Id.* at ¶¶ 62, 286.

This cloud of assertions is little more than a catch-all compilation of facially unrelated conclusions without the necessary factual plausibility that would support a claim that "but for" Kovach's age, he would have been treated more favorably by his employer and his Union. *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009) (the Third Circuit explaining that the Supreme Court's interpretation in *Gross* requires "plaintiff [to] prove but-for causation from the outset of an ADEA case.") (citing *Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 176-77 (2009)); *see Hodczak v. Latrobe Specialty Steel Co.*, 761 F. Supp. 2d 261, 279-81 (W.D. Pa. 2010), *aff'd*, 451 Fed. App'x 238, 241-42 (3d Cir. 2011) (rejecting ADEA claim premised on alleged ageist comments of employer executive). Plaintiff also fails to allege what the Union's statutory obligation was in these regards and how that obligation was breached, and how and why it is plausible that "but for" Kovach's age, Turner would have applied different terms and conditions of employment to him. This pleading gap is especially noticeable in the context of Plaintiff's lengthy, detailed and profoundly predominant allegations that it was the threatening and violent

---

[25] To the extent Kovach's age claims somehow relate to what he viewed as a contractual seniority system for shift assignment that was less favorable to him, he nowhere addresses the application of 29 U.S.C. §623(f)(2)(A), which provides a safe harbor for negotiated seniority systems.

conduct of the Union and its officials, and Turner's inaction in response, that forced him to resign. Finally, for the same reasons noted in regard to his FLSA claims, the TAC simply does not measure up under the *Twiqbal* standard in terms of showing that Plaintiff was "constructively discharged" because of his age.[26]

Plaintiff has now had four (4) opportunities to plead an ADEA case. These Counts of the TAC cannot in any fashion be construed as "pleading in the alternative" but instead would require the existence of two alternative universes – one in which Kovach's woes centered on direct physical threats because of and related to conflicts about Union operations with Union officials, and a second one, detached from the first, supposedly based on his age. That fundamental dissonance, coupled with the weak and disconnected nature of assertions related to his age claims, demonstrates to the Court that even after four (4) pleading efforts, they cannot cross the requisite plausibility threshold. The compilation of events now pled does not meet the minimal pleading test under *Twiqbal*. These claims are therefore dismissed with prejudice.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are granted with regards to subsection 29 U.S.C. § 411(a)(1) of Count I, and Counts VII, VIII, IX, X, and XI. Such claims are dismissed with prejudice. An appropriate order will follow.

Mark R. Hornak
United States District Judge

Dated: March 8, 2013
cc:  All counsel of record

---

[26] Plaintiff's allegations at TAC ¶ 286 that Shafer was "substantially younger" than Plaintiff does nothing to connect up Shafer's behavior with Plaintiff's age, nor does it do anything to demonstrate any connection at all between any objectively intolerable conduct by Turner and Plaintiff's age.