IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NICK KOVACH,                          )
                                      )
              Plaintiff,              )     Civil Action No. 2:12-cv-00432
                                      )     Judge Mark R. Hornak
       v.                             )
                                      )
SERVICE PERSONNEL & EMPLOYEES         )
of the DAIRY INDUSTRY, LOCAL          )
UNION NO. 205; GREG SHAFER; and       )
WILLIAM LICKERT,                      )
                                      )
              Defendants.             )

## OPINION

**Mark R. Hornak, United States District Judge**

On April 4, 2012, Plaintiff Nick Kovach ("Mr. Kovach") sued his former employer,
Turner Dairy Farms, Inc. ("Turner Dairy"), and his former union, the Service Personnel and
Employees of the Dairy Industry, Local Union No. 205 ("Local 205")[1], as well as two Local 205
members, William Lickert, Jr., ("Mr. Lickert") and Greg Shafer ("Mr. Shafer"). Mr. Kovach
repeatedly amended his Complaint and finally settled on asserting a variety of federal, civil and
state law tort claims against the collective Defendants. Those Defendants filed Motions to
Dismiss, and in a lengthy Opinion, the Court dismissed several of Mr. Kovach's claims against
Local 205 and Turner Dairy. *See Kovach v. Turner Dairy Farms, Inc.*, 929 F. Supp. 2d 477
(W.D. Pa. 2013). The Court later dismissed the rest of his claims against Turner Dairy pursuant
to a stipulation of dismissal filed by the parties under Fed. R. Civ. P. 41(a)(1). ECF No. 61.

Mr. Kovach then filed a Fourth Amended Complaint ("FAC"), reasserting his surviving
federal law claims against Local 205 and Messrs. Lickert and Shafer ("Defendants") under the

---

[1] Local 205 is affiliated with the International Brotherhood of Teamsters. Plaintiffs' Statement of Facts, ECF No.
119, at ¶ 2.

Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411(a)(2), 501[2], as well as state law tort claims for intentional interference with contractual relations (against Local 205), negligent supervision and retention (against Local 205), and assault (against Mr. Shafer and Local 205). ECF No. 66. He alleges that the Defendants are subject to liability on these sundry claims because he was placed at risk of serious bodily harm and in fear for his life, and consequently was forced to quit his job with Turner Dairy, when Mr. Shafer, the Union Steward, threatened to beat him up, harassed him daily, and drove a truck at him multiple times, all in retaliation for Mr. Kovach's protected actions as a Union member. He also claims that the leadership of Local 205, particularly Mr. Lickert as the Secretary-Treasurer (who was in *de facto* control of the Union), knew about this activity and failed to put a stop to it when he had the duty and opportunity to do so.

Now pending before the Court, after extensive development of the record through discovery, are the remaining Defendants' Motions for Summary Judgment. ECF Nos. 101 and 103. The Court has considered the Defendants' Briefs in support of those Motions, ECF Nos. 102 and 104, Plaintiff's Briefs in Opposition, ECF Nos. 116 and 118, and Defendants' Reply Briefs, ECF Nos. 123 and 125; Defendants' Concise Statements of Material Facts, ECF Nos. 100 and 107, Plaintiff's Responses, ECF Nos. 115 and 117, and Statement of Facts, ECF Nos. 119-120, and Defendants' Responses, ECF Nos. 124 and 127. The Court also heard oral argument on the Motions on July 16, 2014. ECF No. 128.

The Motions are granted in part and denied in part for the reasons that follow.

---

[2] 29 U.S.C. § 412 allows union members to sue in federal court when rights guaranteed by the LMRDA have been violated, and provides: "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

## I.  BACKGROUND

Mr. Kovach became a member of Local 205 in 1983, when he was hired by Taylor Milk Company.  Plaintiff's Statement of Facts ("PSOF"), ECF No. 119, at ¶ 2.  In 1989, he got a job as a truck driver for Turner Dairy, where he remained a Local 205 member.  *Id.* at ¶ 4; Defendant's Statement of Facts ("DSOF"), ECF No. 107, at ¶¶ 1, 3.  While at Turner Dairy, Mr. Kovach's route required him to make deliveries five days a week for eight hours a day, or "5-8s."  DSOF, at ¶ 8; PSOF, at ¶ 6.  Mr. Kovach began to express a desire to have his route changed to four ten-hour days per week, or "4-10s."  PSOF, at ¶ 15; DSOF, at ¶ 9.  At the time, Turner Dairy could change a route from 5-8s to 4-10s, but first had to put it up for bid based on seniority.  PSOF, at ¶ 8.

Mr. Shafer had become a truck driver with Turner Dairy in 1985.  DSOF, at ¶ 2.  Around 2006, he was appointed as the Local 205 Steward for Turner Dairy drivers.  *Id.* at ¶ 4.  Local 205's by-laws describe a Steward's duties as including (1) posting all Union notices, including notices of Union meetings; (2) advising new employees of the conditions of employment under the agreement between the employer and the Union and of the employee's obligation to abide by the same; (3) handling grievances and disputes between the employer and the employees in the bargaining unit; (4) seeing that the provisions of the agreement between the employer and the Union are observed, and reporting to the Union any breaches of that agreement; and (5) attending all shop or chapel meetings.  ECF No. 107-9, at 12–13.

In 2011, while Turner Dairy and Local 205 were negotiating a new collective bargaining agreement, Turner Dairy proposed as part of the agreement that it would be allowed to change a driver's route schedule from 5-8s to 4-10s[3] without posting the route for bid.  DSOF, at ¶¶ 10–

---

[3] This arrangement would allow drivers to move from a workweek of five (5) eight hour days to one consisting of four (4) ten hour days.

11. Local 205 counter-proposed that such a change could only be made once per collective bargaining agreement, and the driver would have to agree to the change. *Id.* at ¶ 12. Mr. Kovach strenuously objected to that proposal because he believed that it violated his seniority rights in bidding on such routes. *Id.* at ¶ 13. Mr. Lickert and Mr. Shafer both testified at their depositions that they knew of Mr. Kovach's views on seniority and his objection to the proposal. Deposition of William Lickert, Jr. ("Lickert Dep."), ECF No. 107-4, at 80; Deposition of Greg Shafer ("Shafer Dep."), ECF No. 107-3, at 60–61, 69. Mr. Shafer testified that Mr. Kovach had expressed his opinion on seniority to him "hundreds of times." Shafer Dep., at 61.

Local 205 was scheduled to hold a meeting on May 1, 2011 regarding the proposals for the new contract, including the proposal that would allow Turner Dairy to change a route from 5-8s to 4-10s without putting it up for bid. DSOF, at ¶ 15. At such meetings, a "strike vote" is held, where the attending Union members vote to accept or reject the proposed contract terms as a package deal. *Id.* at ¶¶ 16, 18. Union members may also comment on specific proposals. *Id.* at ¶ 21. Prior to May 1, 2011, Mr. Kovach told Mr. Shafer that he might not be able to attend the meeting and gave Mr. Shafer a signed and dated piece of paper reading: "I don't agree with the changes at the proposal."[4] *Id.* at ¶ 24. Mr. Kovach did not attend the May 1, 2011 meeting. *Id.* at ¶ 33. He remained at home with his wife, who had recently suffered an eye injury. *Id.* at ¶ 34. At the meeting, the attending Union members voted unanimously (52 to 0) to reject management's proposals and authorize a strike. *Id.* at ¶ 39. Mr. Kovach's paper vote was not counted. *Id.* at ¶ 27.

---

[4] There is a factual dispute between the parties as to whether Mr. Kovach was permitted to vote by proxy at the meeting. Mr. Kovach says that he previously asked William Lickert, Sr., the former Union President, whether he could do so and was told it was "okay." Deposition of Nick Kovach, ECF No. 107-2, at 123–24. Mr. Lickert, Jr. testified that in his experience, Union members were never allowed to vote on issues on paper rather than by going to the meeting and voting in person. Lickert Dep., at 82–83.

The next morning, Mr. Kovach and Mr. Shafer were in the offices of Turner Dairy. *Id.* at ¶ 40. Mr. Kovach asked Mr. Shafer what happened at the meeting with regard to the contract proposal and the seniority issue. *Id.* Mr. Shafer responded by telling Mr. Kovach to "shut the f—k up," and told Mr. Kovach he was "tired of your sh-t," and had been "hearing it for fifteen years," *id.* at ¶ 41, adding "let's go down over the hill right now," which Mr. Kovach and Paul Smith ("Mr. Smith"), another driver who was present, interpreted as an invitation to a physical altercation. *Id.* at ¶ 50; PSOF, at ¶ 34; Deposition of Paul Brad Smith ("Smith Dep."), ECF No. 107-7, at 27. Mr. Kovach said, "I have the right to express my views on union business," to which Mr. Shafer retorted, "I have the right to express my views too, go f—k yourself," and said that if Mr. Kovach cared what happened, he should have attended the meeting. DSOF, at ¶¶ 46–47; PSOF, at ¶ 40. Mr. Kovach spoke with Mr. Lickert about the incident and told him that he should remove Mr. Shafer as Steward. PSOF, at ¶¶ 54, 59; DSOF, at ¶ 68. He also reported the confrontation to Turner Dairy. DSOF, at ¶ 61; PSOF, at ¶ 52.

Both Mr. Kovach and Mr. Shafer testified that prior to May 2, 2011, they had little interaction and had never had a personal disagreement. Deposition of Nick Kovach ("Kovach Dep."), ECF No. 107-2, at 100–01; Shafer Dep., at 51–52. But after that, their relationship quickly escalated into daily adversity. According to Mr. Kovach:

> [f]rom when this incident began May 1 up until the day that I quit, I was harassed by [Mr. Shafer] on a daily basis every day, telling me to go f—k myself, calling me a m-----f----r, threatening me every day. It was badgering every day in the drivers' room, relentless, every day.

Kovach Dep. at 174. Mr. Shafer admitted that problems were occurring between himself and Mr. Kovach on a daily basis. Shafer Dep., at 99–100. Mr. Smith also testified that "[t]hey would bicker every day like two little kids in a playground. Probably every time they seen each other, put it that way . . . Every day Greg would say, good morning, Nick, how you doing, good

old buddy, and Nick would just be mad and say don't talk to me." Smith Dep., at 17–18, 20. Lou Palmer ("Mr. Palmer"), the Turner Dairy morning supervisor, testified that the two would argue every day in the drivers' room before they left for their routes. Deposition of Lou Palmer ("Palmer Dep."), ECF No. 120-18, at 6–7. Robert Young, also a Turner Dairy driver, testified that he recalled Mr. Shafer mocking Mr. Kovach, and that discussion of the issues between Mr. Shafer and Mr. Kovach "was a regular occurrence in the break room because it was an active situation." Deposition of Robert Young ("Young Dep."), ECF No. 120-13, at 40–41, 46.

On May 8, 2011, Local 205 held a ratification meeting, where the attending Union members voted on whether to accept or reject the proposed contract. DSOF, at ¶ 55. Mr. Kovach attended that meeting, spoke out in protest against the provision allowing Turner Dairy to change a route from 5-8s to 4-10s without first putting it up for bid, and voted against the contract. *Id.* at ¶¶ 56, 59. The Union members voted to ratify the proposed contract by a count of 50 to 2. *Id.* at ¶ 57.

In response to Mr. Kovach's complaint, Mr. Lickert organized a meeting on May 26, 2011, between himself, Mr. Shafer, Mr. Kovach, and John Winters ("Mr. Winters"), Local 205's Business Agent, at a local Eat N' Park restaurant. *Id.* at ¶¶ 70–71; Deposition of John Winters ("Winters Dep."), ECF No. 107-5, at 12–13. Mr. Kovach related his version of the events of May 2, 2011, and reasserted his demand that Mr. Shafer be removed as Steward. DSOF, at ¶¶ 72-73, 77–78. Mr. Shafer admitted that the argument had taken place, and that he had lost his temper with Mr. Kovach. *Id.* at ¶ 75; PSOF, at ¶ 77. Mr. Kovach testified that Mr. Shafer also said, "If you would come to me like a man, and put your big boy pants on, we could have resolved this." Kovach Dep., at 158. Mr. Lickert said that he would not remove Mr. Shafer unless Mr. Kovach submitted a petition signed by 51 percent of the Union members, as provided

6

by the Local 205 by-laws.[5]  DSOF, at ¶¶ 79–80.  He told Mr. Shafer and Mr. Kovach to "knock it off" and concluded the meeting.  *Id.* at ¶ 85–86.

On May 30, 2011, Mr. Kovach sent a letter to Mr. Lickert, purporting to summarize what happened at the May 26, 2011 meeting, calling Mr. Shafer a substandard Union representative, again requesting that he be removed as Steward, and essentially questioning what kind of an outfit Mr. Lickert was running.  ECF No. 107-12.  Mr. Kovach also included in the letter that since the May 2, 2011 incident, Mr. Shafer was now greeting him daily with, "Hi, Nick, how the f—k are ya?"  *Id.*  Mr. Kovach warned Mr. Lickert that he would ultimately be responsible if "this situation continues to escalate and becomes volatile."  *Id.*

Mr. Lickert responded to Mr. Kovach on June 3, 2011, in a letter copied to Mr. Shafer. ECF No. 107-13.  He wrote that he would not tolerate a Union member harassing a Steward on a daily basis, and that "You seem to feel you can say anything at any time and the Steward is obligated to continue to listen to you and respond in a manner you want . . . your behavior has probably created this situation."  *Id.*  Mr. Lickert continued:

> Even if I did remove Brother Shafer from the position of Union Steward (which I have no intention of doing), that would not change anything.  You would only start on the new Steward with your same complaints and after a period of time we would be back in this same position.  If you would like a four (4) ten (10) hour route with weekends off, I say bid on one and when your seniority prevails you will receive it.

*Id.*  He concluded with: "[I]f something escalates or becomes volatile, you as a grown man and father are responsible.  I have not and will not condone nor encourage any further action on either of your parts! . . . P.S. Nick, there is an old saying – it is better to remain silent and be thought foolish than to open your mouth and remove all doubt."  *Id.*

---

[5] Mr. Kovach points to another provision in the Local 205 by-laws that places authority in the Secretary-Treasurer to "remove and replace any Shop Steward when he believes such is in the best interest of the Union."  *See* ECF No. 107-9, at 12.  He claims that is the action he was urging Mr. Lickert to take, that it is what Mr. Lickert should have done, and Mr. Lickert's failure to do so is why he has valid federal law claims against Local 205 and Mr. Lickert.

Mr. Kovach claims that was not the end of the affair. He alleges that on August 16, 2011, while he was in the Turner Dairy parking lot, Mr. Shafer drove at him in his truck, causing him to jump out of the way and to be hit with rocks. PSOF, at ¶ 111–13. According to Mr. Kovach, a similar incident occurred again on September 27, 2011. *Id.* at ¶ 119. On or around the first week of October 2011, Turner Dairy President Chuck Turner ("Mr. Turner") called Mr. Winters twice about Mr. Shafer's behavior. DSOF, at ¶ 105. At his deposition, Mr. Turner testified that he told Mr. Winters that he couldn't "get Greg to stop acting like he's in junior high," that Mr. Shafer was calling Mr. Kovach "Nicholas" instead of "Nick," asking him "how the f—k are you," and "swearing and acting like a thirteen year old." Deposition of Chuck Turner ("Turner Dep."), ECF No. 107-6, at 136–37, 176–78. According to Mr. Turner, Mr. Winters was aware of the daily verbal sparring between the two men and agreed that Mr. Shafer's conduct needed to stop. *Id.* at 123, 135–36. In their second conversation, Mr. Turner told Mr. Winters he believed Mr. Shafer had "finally gotten the message." *Id.* at 181–82.[6]

But in Mr. Kovach's version of events, Mr. Shafer had not gotten the message. Mr. Kovach says that on October 27, 2011, as he was driving to work, Mr. Shafer

> raced up behind me flashing his lights, revving his engine, and he is a couple of inches off of my bumper, flashing his high beams, racing his engine. Then he passed me on the left, on the double yellow line. Then he goes in front of me and jams on his brakes and he keeps jamming on his brakes to try to get me to wreck into the back of him. That went on several hundred yards.

---

[6] When deposed, Mr. Turner testified that he was made aware of the August 16, 2011 truck-related occurrence and spoke to Mr. Shafer about it, whose account was "much different" and involved Mr. Shafer merely rolling his window down and saying something to Mr. Kovach as he passed. Turner Dep., at 110–11. Mr. Winters testified that he was not aware of any such alleged incident. Winters Dep., at 116–117; *see* Turner Dep., at 174–177. Mr. Kovach did not aver that there was evidence that Mr. Winters knew of either of the alleged August 16 or September 27, 2011 episodes, nor is there any record evidence that Mr. Lickert did. *See* Kovach Dep., at 165–66; Lickert Dep., at 122–23, 134.

Kovach Dep., at 177–78. Mr. Kovach testified that he immediately confronted Mr. Shafer about the incident and then resigned from Turner Dairy that same day, fearing that his life was in danger. *Id.* at 178; PSOF, at ¶¶ 161–62.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c) (1)(A).

Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial,*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(a), (e)) (emphasis in original). In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. The non-moving party "must present *affirmative evidence* in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (emphasis in original). If the non-moving party's evidence merely is colorable or lacks sufficient probative force, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249–50 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See id.* at 250. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587; *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

In reviewing the record evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita*, 475 U.S. at 587–88; *Huston*, 568 F.3d at 104 (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 589 (3d Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 323–24).

## III. DISCUSSION

The FAC asserts five (5) causes of action. First, Mr. Kovach alleges that Local 205 violated his right to free speech and assembly guaranteed by 29 U.S.C. § 411(a)(2), which is commonly known as part of the LMRDA's Union Member Bill of Rights. Second, he contends that Mr. Lickert and Mr. Shafer violated their fiduciary duties as union officers as set out in 29 U.S.C. § 501. Third, he argues that Local 205, through Mr. Shafer, intentionally interfered with his Turner Dairy employment contract by inducing him to resign. Fourth, he brings a negligent

supervision and retention claim against Local 205 in relation to their employment of Mr. Shafer.

Fifth, Mr. Kovach claims that Mr. Shafer committed assault against him for which Local 205 is also liable on an agency theory. The Court will discuss each asserted cause of action in turn.

### A.    Count I – 29 U.S.C. § 411(a)(2) Claim Against Local 205

Section 411(a)(2) guarantees a union member the right of free speech and assembly, subject to the reasonable rules of the union. It reads:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).

In passing the LMRDA, Congress "recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 355 (1989) (quoting *United Steelworkers of Am. AFL-CIO-CLC v. Sadlowski*; 457 U.S. 102, 112 (1982)). As such, the Supreme Court has held that Section 411(a)(2) protects "rank-and-file union members – not union officers or employees." *Finnegan v. Leu*, 456 U.S. 431, 436–37 (1982). While the subject matter of any protected speech must "directly relate" to the union-member relationship, *Semancik v. United Mine Workers of Am. Dist. No. 5*, 466 F.2d 144, 154 (3d Cir. 1972), the Third Circuit has articulated a general rule that under the LMRDA, "the members' right of free speech is given an expansive protection." *Mallick v. Int'l Broth. of Elec. Workers*, 644 F.2d 228, 235 (3d Cir. 1981).

District courts in this circuit have established that the broad sweep of Section 411(a)(2) encompasses the protection of dissident union members from intimidation and harassment in invoking their rights to speak freely about union matters. In *Maier v. Patterson*, the plaintiff and other union members met with the defendant, the union's business agent, to complain about their employer and his performance. 511 F. Supp. 436, 439 (E.D. Pa. 1981). The same group had petitioned for the defendant's removal as business agent several years earlier. *Id.* During the course of the meeting, the defendant vocally determined the plaintiff to be a "sh-tstirrer" and then pushed his head through a glass window. *Id.* The court concluded that a jury could find the assault was retaliation for the plaintiff's criticism of the defendant's job performance, and for the earlier removal petition due to a prior threat the defendant made at the time of the petition. *Id.* at 447.

Although Mr. Shafer never physically harmed Mr. Kovach to such a degree, the law does not require physical harm for a Section 411(a)(2) claim to lie. Section 411(a)(2) provides a remedy "not only for direct reprisals against dissenters, but also for union conduct that inhibits or threatens dissenting speech." *Ackley v. W. Conference of Teamsters*, 958 F.2d 1463, 1475 (9th Cir. 1992). "It is absurd to require that a union *succeed* in an attempt to intimidate dissidents before a Section 411 violation is established." *Murphy v. Int'l Union of Operating Eng'rs, Local 18*, 774 F.2d 114, 126 (6th Cir. 1985) (emphasis in original). In *Wiglesworth v. Chauffeurs, Teamsters & Helpers Local Union 771*, the court declined to grant summary judgment for the defendant on a Section 411(a)(2) claim where, after the plaintiff filed a vacation procedure grievance, the business agent of the local union encouraged union members to physically assault the plaintiff, and the plaintiff then received threats to his safety. 1985 WL 3230, at *8–9 (E.D. Pa. Oct. 22, 1985).

12

Here, the record paints a picture of a continuing course of conduct by Mr. Shafer, stemming from the May 2, 2011 confrontation that began when Mr. Kovach asked a question regarding the outcome of a Union meeting about Union business, that a jury could find to be intimidation and harassment in reprisal for Mr. Kovach's recurring inquiries and opinions about the status of his route and his seniority and his criticism of Mr. Shafer's actions as a Union Steward. Mr. Kovach had a long history of speaking out to Union leaders about his opinions on Union matters, specifically about seniority rights. Plainly, at least some Local 205 members thought that Mr. Kovach was, as described in *Maier*, somewhat of a "sh-tstirrer" on the matter. Mr. Shafer testified that Mr. Kovach had talked to him about the issue "hundreds of times" over many years, and he likened Mr. Kovach to a broken record on the issue. Shafer Dep., at 60–64. Mr. Lickert and Mr. Winters said that previous Stewards complained about Mr. Kovach's persistence in voicing his opinion on seniority. Lickert Dep., at 46–48, 101–102; Winters Dep., at 106–109. In Mr. Lickert's opinion, Mr. Kovach simply could not accept that his views on the seniority matter would not prevail. Lickert Dep., at 46–47.

From its inception, Mr. Kovach directly took issue with the Union's position on the new contract proposal. *See* Kovach Dep., at 105–06. When he confronted Mr. Shafer on May 2, 2011, he criticized Mr. Shafer's performance as Steward, *see* Kovach Dep., at 128; Shafer Dep., at 79, and later asked Mr. Lickert to remove Mr. Shafer from his position. *See* Kovach Dep., at 136; Shafer Dep., at 89. Seniority issues that are in the process of being voted on by the Union and criticism regarding Union leadership directly relate to Union issues. *See Semancik*, 466 F.2d at 153 (explaining that unions may not discipline members' speech except in narrow circumstances).

Unions may be held liable for the actions of their officers under common law theories of agency. *Urichuck v. Clark*, 689 F.2d 40, 43 (3d Cir. 1982). "Thus, if their actions fall within the scope of their authority, they are acting for the union and whatever liability flows from their actions flows to the union also." *Id.* A union may be liable for condonation of an officer's conduct by approval with knowledge. *Maier*, 511 F. Supp. at 440. Local 205 contends that it cannot be liable for Mr. Shafer's conduct for several reasons: (1) As Steward, Mr. Shafer was not a Union officer; (2) Mr. Shafer was not acting in an official capacity when he allegedly harassed Mr. Kovach; and (3) there is no evidence that Local 205 knew of or condoned Mr. Shafer's behavior.

The Local 205 by-laws provide: "Shop Stewards shall not be considered Union Officers and their rights, duties, obligations and responsibilities as Stewards shall be limited to those as defined in these Local Union By-Laws." ECF No. 107-9, at 13. However, the Third Circuit has held that a union steward was an agent of the union where he was "the union's conduit for members to air their grievances to the employer" and "the union's representative for the members on the jobsite." *N.L.R.B. v. United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Ass'n, Local 30, AFL-CIO*, 1992 WL 372381, at *20–21 (3d Cir. Aug. 10, 1992). Mr. Shafer testified that his primary duties as Steward were "[t]o be a liaison between the members and the employer and the local itself," and to hear and help resolve members' grievances.[7] Shafer Dep., at 15-17. Additionally, 29 U.S.C. § 501(a) explicitly provides that

---

[7] Mr. Shafer also portrayed the position of Steward to be a virtually unimaginable existence involving hearing innumerable Union member complaints and carrying no real heft. *See* Shafer Dep., at 13–20. Whether or not that is true, it is plain that at least at the outset of the May 2, 2011 confrontation between Mr. Kovach and Mr. Shafer, a jury could find that Mr. Shafer was asking a Union agent about Union business, and that everything that occurred between the two men after that flowed from an intention on Mr. Shafer's part to get Mr. Kovach to stop raising the seniority issue once and for all.

stewards occupy positions of trust in relation to the labor organization and its members. The Court therefore concludes that a jury could find that Mr. Shafer was an agent of Local 205.

Local 205 further argues that any alleged actions Mr. Shafer took against Mr. Kovach were not in his official capacity, because the tension between Mr. Kovach and Mr. Shafer was a two-way street and simply "involved two guys not wanting to get along." Turner Dep., at 104. The Third Circuit has stated that "[p]rivate misconduct" giving rise to "ordinary tort claims" which "incidentally may frustrate [a plaintiff's] rights as a union member does not give rise to an action" under Section 411. *Tomko v. Hilbert*, 288 F.2d 625, 629 (3d Cir. 1961). There is testimony in the record from Turner Dairy drivers and Local 205 officers suggesting that Mr. Kovach was just as much at fault as Mr. Shafer for the problems between the two men, and that the events following May 2, 2011 reflected a personal feud instead of actionable harassment or intimidation on the part of Mr. Shafer. But as the Court has noted above, there is also plenty of evidence that Mr. Shafer retaliated against Mr. Kovach for vocally expressing his own set of values on Union business by harassing him daily and then threatening physical violence against him on a number of occasions. If proven at trial, that would allow a jury to find that Mr. Shafer was using the authority of his official capacity as Steward when he allegedly harassed Mr. Kovach.

There is also sufficient evidence to create a genuine issue of material fact as to whether Local 205 adopted Mr. Shafer's actions by condonation, at least through June 3, 2011, the date of Mr. Lickert's letter to Mr. Kovach, copied to Mr. Shafer. Mr. Lickert knew enough about the situation to hold an in-person meeting with Mr. Kovach and Mr. Shafer, and his letter advised Mr. Kovach that it was better for him to "remain silent." ECF No. 107-13. Mr. Kovach did not report any subsequent incidents involving Mr. Shafer to Union leadership. Kovach Dep. at 174–

75. According to Local 205, Mr. Lickert's letter was the end of the matter as far as the Union was concerned, and it knew nothing more.[8] But even if that were borne out at trial, a jury could conclude that Mr. Winters, at least, knew of Mr. Shafer's continuing verbal conduct, and Local 205 thereby condoned it, and that was the reason Mr. Kovach never again brought his problems with Mr. Shafer to Union management.[9]

Local 205 portrays the issues between Mr. Shafer and Mr. Kovach as arising from a mutual rancor that it did not condone and had no legal duty to stop. Mr. Kovach says that the Union knew about Mr. Shafer's non-stop verbal conduct (at least through the first week of October 2011, when Mr. Turner called Mr. Winters) and simply did nothing to end it, intending his seniority-centric complaints, which previous Stewards had carped about to management, to be handled within the Turner Dairy unit. Portions of the record support both of the parties' two very different sides of the story. That is precisely what creates a genuine, triable material issue

---

[8] Local 205 cites to the Third Circuit's decision in *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283 (3d Cir. 1991), in support of its theory that Union leadership's decision to simply take no further action in the Kovach-Shafer matter did not amount to ratification or condonation of Mr. Shafer's conduct. In *Brenner*, members of a local union brought a claim under Section 301 of the National Labor Relations Act ("NLRA") against their international union for allegedly failing to stop the local union from engaging in discriminatory hiring practices, in retaliation for voting against candidates supported by the local union's business agent and for opposing the business agent's leadership. 927 F.2d at 1286–88. The court held that the district court did not err in granting summary judgment to the defendant, because the international union conducted investigations into the alleged abuses on two occasions, and its mere knowledge of possible illegal activity by the local union was insufficient to impose a duty to intervene. *Id.* at 1289–92.

This case does not present the same issues. Although the liability standard for international unions in breach of contract actions is also governed by common law rules of agency, *see Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216–18 (1979), *Brenner* dealt with a claim lodged under the NLRA, and with the scope of liability of an international union for the actions of its locals. This case involves the scope of liability of a local union for the actions of its own local officials. As a result, different factual considerations are at play here. Also, the extent of Local 205's "investigation" was a one-time meeting with the Secretary-Treasurer where he admonished Mr. Kovach and could be found to have largely excused Mr. Shafer's conduct as "a bad day." While the Court does not hold here that to avoid liability for Mr. Shafer's actions, the Union was required to formally give some sort of order to Mr. Shafer to the effect that Mr. Kovach was not to be bothered, it does conclude that the fact that Local 205's Business Agent, Mr. Winters, remained aware of Mr. Shafer's alleged continuing verbal antagonism of Mr. Kovach months later raises the specter of condonation, at least of Mr. Shafer's verbal badgering. The Court is therefore not convinced that *Brenner* controls or provides the proper analogy.

[9] Mr. Turner testified that Mr. Winters remained aware of Mr. Shafer's alleged daily verbal harassment of Mr. Kovach well into October 2011.

of fact. The Court will therefore deny the Motion for Summary Judgment on Mr. Kovach's Section 411(a)(2) claim against Local 205.

### B.    Count II – 29 U.S.C. § 501 Claims Against Mr. Shafer and Mr. Lickert

With respect to the fiduciary duties of union officers, 29 U.S.C. § 501(a) states in pertinent part: "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group." 29 U.S.C. § 501(b) then provides:

> When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any *member* of the labor organization, such *member* may sue such officer, agent, shop steward, or representative…to recover damages or secure an accounting or other appropriate relief *for the benefit of the labor organization.*

29 U.S.C. § 501(b) (emphasis added).  When subsections (a) and (b) are read together,

> Subsection (b) both creates and limits a cause of action for a member to recover damages caused by an officer, agent, shop steward or representative's breach of the duties established in subsection (a).  A union member seeking to sue under § 501(b) must meet two statutory prerequisites: he or she must first request that the union or its governing officers bring an action, and allege that the union refused or failed to do so, and then must request leave of court to bring the action.  Thus, a § 501(b) action is analogous to a shareholder's derivative suit; a union member brings the action in the name of the organization, *to recover damages belonging to the membership as a whole.*

*Int'l Longshoremen's Ass'n, AFL-CIO v. Spear, Wilderman, Borish, Endy, Spear & Runckel*, 995 F. Supp. 564, 567 (E.D. Pa. 1998) (emphasis added).

Local 205 points out that Mr. Kovach is no longer a member of the organization and contends on that basis that he lacks standing to bring a Section 501 claim.  As support, it cites to *Teamsters, Chauffeurs, Warehousemen and Helpers, Local 764 v. Greenawalt*, 919 F. Supp. 774, 778–89 (M.D. Pa. 1996), *vacated in part and aff'd in part*, 116 F.3d 470 (3d Cir. 1997), where

the court held that the defendant, the former president of a local union, had no standing to bring a third party claim under Section 501, because he lost his union membership when he resigned from office.

29 U.S.C. § 402(o) defines "member" as "any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership." Mr. Kovach argues that although he did leave the Union, he did not do so voluntarily but was forced to out of fear for his safety from Mr. Shafer's threats and harassment. There was no question in *Greenawalt* that the defendant resigned voluntarily–the basis of the action was the propriety of his severance pay. 919 F. Supp. at 777. The Court concludes that a genuine issue of fact exists as to whether Mr. Kovach voluntarily or involuntarily withdrew from Union membership, and therefore as to whether he has standing to bring a Section 501 claim against Local 205.

But that's not all. Messrs. Lickert and Shafter also contend that the Court should grant summary judgment on the Section 501 claim because Mr. Kovach requests relief not authorized by Section 501(b)–money damages accruing to him alone, with no measurable benefit to the Union. As noted in *Spear*, the thrust of the language of Section 501(b) goes to a derivative-type action for the union's benefit. It speaks specifically to union officers failing or refusing to file suit or recover damages, an accounting, or other appropriate relief for the benefit of the union. At the same time, the Third Circuit has held that the fiduciary duties of union officers under Section 501 are broad in scope, *Sabolsky v. Budzanoski*, 457 F.2d 1245, 1250 (3d Cir. 1972), and include the obligation to insure the political rights of all members of their organization, *Semancik*, 466 F.2d at 155, namely, the rights arising under Section 411. *O'Rourke v. Crosley*,

847 F. Supp. 1208, 1221 (D.N.J. 1994). This fiduciary principle extends to all activities of union officers and agents. *Sabolsky*, 457 F.2d at 1250.

Mr. Kovach points to that body of law and to other district court cases discussing Section 501 claims. In *O'Rourke*, the plaintiff alleged that he was subjected to harassment and intimidation from other union members because he accepted a job at a construction site where an employer was being picketed, and the defendant union officers knew of the harassment and did nothing about it. 847 F. Supp. at 1211, 1220–21. But *O'Rourke* dealt with a motion to dismiss a Section 501 claim on the basis that the plaintiff had not first requested that the union "sue or recover damages or secure an accounting or other appropriate relief" or shown "good cause" before filing his suit, as required by Section 501(b).[10] *Id.* at 1218–21. There was no allegation there that the plaintiff was claiming relief not authorized under the statute.

In *Wiglesworth*, the basis of the plaintiff's Section 501 claim was that the local union's business agent encouraged union members to beat up the plaintiff because the plaintiff filed a vacation procedure grievance, he then received threats against his safety, and the Secretary-Treasurer refused to investigate the incident or punish the business agent. 1985 WL 3230, at *7. Along with compensatory and punitive damages and attorney's fees, the plaintiff specifically sought an order enjoining the defendants from interfering with his Section 411 rights, relief not sought here. *Id.* at *6. The court declined to grant summary judgment for the defendant. *Id.* at *11.

Here, the FAC asserts the Section 501 claim in Mr. Kovach's name, not Local 205's, alleges that he "has suffered and continues to suffer damages including, but not limited to, the

---

[10] In its prior Opinion, the Court determined that Mr. Kovach's Third Amended Complaint met Section 501(b)'s "request" and "good cause" requirements. *See Kovach*, 929 F. Supp. 2d at 493–95. For the same reasons stated there, the FAC is also sufficient in those regards.

loss of employment, the loss of wages, the loss of health benefits, loss of retirement benefits, emotional distress including serious headaches, and incurred necessary attorney's fees and costs," and seeks "all remedies and damages permitted by law under 29 U.S.C. § 501, et seq., including but not limited to, compensatory damages, attorney's fees and costs, and pre-judgment and post-judgment interest." FAC, at ¶¶ 151–52.[11] The FAC does not pray for any relief benefitting the Union, such as a request for an injunction against conduct violative of Section 411 (like in *Wiglesworth*), or give any other indication (or even hint) that any requested relief would flow to the Union or to its benefit, either of which would suggest Mr. Kovach's Section 501 claim is brought for the benefit of the Union in any respect. Simply put, through five (5) versions of the Complaint, all of Mr. Kovach's claims and the relief sought are for the benefit of Mr. Kovach.

Although *O'Rourke* and *Wiglesworth* are factually similar to this case, in terms of the relief requested, *Fraser v. James*, 655 F. Supp. 1073 (D.V.I. 1987), proves to be a more apt comparison. There, the plaintiffs alleged that their local union's representatives discriminatorily denied them strike funds after the plaintiffs refused to picket during a lockout. *Id.* at 1075. The plaintiffs sought recovery of those funds under Section 501, alleging a breach of the union's duty to fairly represent them and a violation of the constitution of the international union. *Id.* The court granted summary judgment to the defendants on the Section 501 claim, concluding that the suit was "clearly for the benefit of the plaintiffs themselves, rather than the union . . . . such monies, if recovered, would directly proceed to the plaintiffs' account." *Id.* at 1078.

At the July, 2014 oral argument on these Motions, Plaintiff's counsel suggested for the first time that the "other appropriate relief" stated in Section 501(b) that would be recoverable in

---

[11] Each of the four (4) prior versions of Mr. Kovach's Complaint contained the same formulation as to the harm he allegedly suffered, and the relief he sought. None state that Mr. Kovach was seeking any relief on behalf of the Union, or anyone other than himself.

this case was a declaration that Union leadership condoned all of Mr. Shafer's actions and an injunction removing Mr. Shafer as Steward, along with Mr. Kovach's attorney's fees. But that is not what the FAC requests, and other than for the fee shifting plea,[12] the Court has located zero case law authorizing such relief, nor has Mr. Kovach directed it to any. Further, the language of Section 501 strongly suggests that its reference to "other appropriate relief" entails relief that the union would or could seek in a lawsuit it could (or should) file, but had not. Under Mr. Kovach's oral argument-activated theory, although he never asked for it in his five (5) Complaints in this Court, he really is suing to have this Court order that the Union dismiss Mr. Shafer as Steward, presumably because neither Mr. Lickert nor Mr. Shafer sued the Union itself to remove Mr. Shafer.[13] The express language of Section 501 does not support that theory, and if it did, it would in reality convert Section 501 into a general "enforcement of duties clause" that on these facts, in this case, mirrors Mr. Kovach's Section 411 claim.[14]

---

[12] *See Hall v. Cole*, 412 U.S. 1, 10 n.15 (1973) ("Section 501(b) authorizes 'fee shifting' in a suit brought by a member against a union official to recover damages or for an accounting for the benefit of the union on the ground that the official is violating his duties.")

[13] The FAC at paragraph 152 seeks "all remedies and damages permitted by law under 29 U.S.C. § 501," and then states "including but not limited to, compensatory damages, attorney's fees and costs, and pre-judgment and post-judgment interest." Especially given that Plaintiff has advanced no case law in support of his new remedial request, that formulation gives no notice that he was seeking an injunction removing Mr. Shafer as a Steward. One can read the FAC in vain to find any effort by Mr. Kovach to ask for or seek any relief for anyone other than himself, and it was only a relative "Hail Mary" at oral argument that raised the specter of his thinking about any remedy for the benefit of the Union membership. Thus, nothing about the context Mr. Kovach created by his pleadings can be fairly construed as seeking anything on behalf of the Union. Further, under Mr. Kovach's new theory, a Section 501 claim against Mr. Shafer would fail as a matter of pure logic, as Mr. Kovach would in essence be suing Mr. Shafer for Mr. Shafer's failing to have the Union sue Mr. Shafer to remove Mr. Shafer.

[14] To be sure, *Sabolsky* stands for the proposition that there need not be a fiscal loss to the Union to permit a Section 501 action, so long as the relief inures to the benefit of the union. 457 F.2d at 1250–51. There, the issue was the union's maintenance of multiple, small union locals in direct contravention of express terms of the union constitution. *Id.* at 1248. Mr. Kovach, by counsel at oral argument for the first time, posited that this Court could order Mr. Shafer dismissed as a Steward and the Union would thereby benefit (even though there is no record evidence to indicate that anyone but Mr. Kovach wanted Mr. Shafer out or found his discharge of his stewardly duties the least bit oppressive). What makes this case far different from *Sabolsky* is that Kovach's five (5) Complaints in this Court never asked for that or any other relief for "the Union" (unlike the thrust of the entire case in *Sabolsky*). In *Sabolsky*, the whole point of the lawsuit was the accomplishment of the very goals set out in the text of Section 501, that is benefiting the union *qua* union. Further, unlike the situation in *Sabolsky*, the record here reveals that Mr. Kovach was told of a route to remove Mr. Shafer as Steward that was not dependent on Mr. Lickert

The Court does not conclude that the FAC as stated seeks Section 501 relief for the Union's benefit. The Court declines to grant Mr. Kovach leave to amend his Complaint for a fifth time to now include a prayer for the Union-centric relief which he first suggested at oral argument was recoverable under Section 501, that is injunctive relief removing Mr. Shafer as a Union Steward. While our Court of Appeals has plainly stated that "[a]bsent an 'apparent or declared' reason for the denial, the leave to amend 'should, as the rules require, be freely given,'" *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 519 (*quoting Foman v. Davis*, 371 U.S. 178, 182 (1962), Fed. R. Civ. P. 15(a)), at the same time, the decision to grant or deny leave to amend a complaint is committed to the sound discretion of the District Court, and leave to amend may be denied if it is tainted by undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility of the amendment. *Foman*, 371 U.S. at 182. "[I]nstances could occur in which the failure to make a timely motion to amend a complaint would place an unwarranted burden upon a trial court, or be prejudicial to the party opposing the motion. In such circumstances, however, the obligation of the trial court . . . is to articulate the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reason for delay." *Coventry*, 856 F.2d at 520.

Mr. Kovach's attempt for the first time at oral argument to suggest other relief that this Court could grant under Section 501 conjures the very essence of such undue delay and bad faith (as that term is used in this context). "[U]ndue delay involves instances where a movant had previous opportunities to amend a complaint before judgment, but did not." *Reginella Constr.*

---

taking any action, that is a petition signed by the majority of Union members at the Turner job site. Mr. Kovach did not try that approach. In *Sabolsky*, the plaintiffs (acting on behalf of 100-plus petitioning union members) necessarily had to seek judicial relief for the benefit of the union outside of the union. *Id.* at 1251.

*Co., Ltd. v. Travelers Cas. and Sur. Co.*, 971 F. Supp. 2d 470, 479, *aff'd*, 568 Fed. App'x. 174 (3d Cir. 2014) (W.D. Pa. 2013) (citing *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001)). Mr. Kovach has had and has taken five (5) such opportunities to so plead (the original Complaint and its four amendments) and has had over two years since the filing of his original Complaint to include any prayer for relief directed to the benefit of the Union. Throughout all the various changes to his Complaint, he has never once requested any such remedy. Instead, since day one, Mr. Kovach's Section 501 claim, and his lawsuit as a whole, has been about turning the Defendants' money into Mr. Kovach's money, and that alone.

Amendment here would prejudice the Defendants at least in terms of requiring substantial additional discovery, given that this would be a significant and different sort of remedy than all of those previously sought, and one implicating Union governance issues not inherent in a personal money damages claim. While in his Section 501 Count Mr. Kovach does not sue the Union, one would suppose that as to this relief, it would be the Union that would have the most significant interest in asserting its organizational prerogatives to select its Stewards. Certainly, none of the five (5) Complaints to date would have put the Union on notice that Ms. Shafer's Steward status was being challenged, with the targeted discovery which would have been attendant to the litigation of those issues and a proposed removal remedy. This newly-espoused injunctive relief would surely inject into the case new issues, and new avenues of discovery. In addition, "a significant, unjustified, or 'undue' delay in seeking the amendment may itself constitute prejudice sufficient to justify denial of a motion for leave to amend." *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 629 (3d Cir. 2013); *see Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993) (denial of motion to amend based on undue delay, previous failures to amend, and futility of amendment). "When a party delays making a motion to amend until after summary

judgment has been granted to the adverse party . . . the interests in judicial economy and finality of litigation may become particularly compelling." *Cureton*, 252 F.3d at 273. It is also worth noting that at no time between when the filing of the summary judgment motion attacking the Section 501 claim and when oral argument on these summary judgment motions was held back on July 16, 2014, did Mr. Kovach seek to amend his Fourth Amended Complaint to assert, for the first time, any effort to gain injunctive relief for the benefit of the Union via the judicially-compelled removal of Mr. Shafer as a Steward.

Mr. Kovach's asserted new avenue for relief also does not implicate Fed. R. Civ. P. 54(c), which directs the Court to award all relief permitted by law, and which is aimed at protecting plaintiffs from "clumsy pleading, which, through technical oversight, might deprive it of a deserved recovery. 'The [rule's] most common usage is when the amount of the award varies from the demand for relief.'" *USX Corp. v. Barnhart*, 395 F.3d 161, 165 (3d Cir. 2004) (internal citation omitted). Mr. Kovach's pleading, amounting at this point to more than 1,200 paragraphs, is anything but clumsy. It has been conscious and direct in solely seeking compensatory damages for him under each of the theories espoused, including under Section 501. It is also worth acknowledging that after Mr. Kovach filed his Third Amended Complaint, the Court held oral argument on various Motions to Dismiss filed by the Defendants, and thereafter, dismissed six (6) other claims with prejudice. Thus, it is plain that over the course of his pleading journey in this case, Mr. Kovach has with factual and legal precision advanced not only the legal theories that are now before the Court, but many others that did not make the grade. Within that context, it is impossible for this Court to conclude that there has been an inadvertent or "clumsy" oversight on his part that has caused his concerns for the judicial removal of Mr. Shafer to only now rise to the top. Further, Mr. Kovach has neither identified nor

provided any new facts, at oral argument or since, that intimate that it was not until oral argument that Mr. Kovach's "protection of the Union" concerns could have been raised by him, and that they were factually or legally unavailable to him at any earlier point on the pleading pathway. Rather, it is readily apparent to the Court that Mr. Kovach is now engaging in a last-ditch effort to avoid dismissal of the Section 501 claim. Our Court of Appeals has held that raising new theories via a motion to amend to avoid dismissal warrants a finding of undue delay. *See CMR D.N. Corp.*, 703 F.3d at 630–31.

Which brings us to bad faith, as that phrase is used in this context. Bad faith in these circumstances does not require unethical conduct or evil motive,[15] but instead "entails 'gamesmanship' and 'wait-and-see' tactics that undermine the integrity of the truth-seeking process." *Reginella*, 971 F. Supp. 2d at 479. "Our Court of Appeals 'has declined to reward a wait-and-see approach to pleading,' and has recognized that shoehorning in a 'new theory into the case several years after the beginning of the litigation' is prejudicial to an opposing party." *Trunzo v. Citi Mortg.*, -- F. Supp. 2d --, 2014 WL 4272727, at *6 (W.D. Pa. Aug. 29, 2014) (citing *Jang v. Boston Scientific Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013); *CMR D.N. Corp.*, 703 F.3d at 630–31). That is precisely what Plaintiff engaged in at oral argument by wheeling out a new remedy that he said he might now seek under Section 501, completely attenuated from anything requested in his five prior Complaints, and entirely geared toward avoiding summary judgment on the Section 501 claim, albeit in the absence of any citation to authority in support of such relief. In conformity with the Third Circuit's directives in

---

[15] And the Court does not find either here.

*Cureton*,[16] the Plaintiff's undue delay in only now seeking new relief under Section 501 counsels that this Court not consider granting leave to amend, again.

Because Mr. Kovach brings his Section 501 claim solely for his own benefit, the Court concludes it does not satisfy the requirements of Section 501(b) and will therefore grant the Motion of Defendants Lickert and Shafer as to that claim and dismiss it.[17]

### C. Count III – Intentional Interference with Contractual Relations Claim Against Local 205

To establish an intentional interference with contractual relations under Pennsylvania law, a plaintiff must demonstrate four elements: (1) a contractual or prospective contractual relationship between the plaintiff and a third party; (2) purposeful action by the defendant, intended to harm the relationship or to prevent a prospective relationship; (3) the absence of privilege or justification for the defendant's actions; and (4) actual legal damage as a result of the defendant's conduct. *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997) (internal citations omitted).

Factors to consider when determining whether such interference is improper include: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (4) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (5) the proximity or remoteness of the actor's conduct to the interference; and (6) the relations

---

[16] Particularly in light of *Cureton*, the Court does not believe that the decision in *Sola v. Lafayette College*, 804 F.2d 40 (3d Cir. 1986) compels a different result. The *Sola* Court acknowledged that this decision rests within the sound discretion of the trial court, 804 F.2d at 45. Particularly in light of the pleading history outlined above, along with the impact on the Defendants and discovery that this eleventh-hour shift in remedies would entail, the Court concludes that its discretion is properly exercised by not allowing yet another amendment.

[17] Surely, Mr. Shafer's vehicular conduct, if proven true, is reprehensible, and the verbal tit-for-tat between Messrs. Kovach and Shafer was at least "sophomoric." The Court's ruling as to the validity of the alleged Section 501 claim is not a judicial stamp of approval on blatant, or even reckless, misbehavior, but only a validation of the rules applicable to the conduct of federal civil litigation. Given the claims which remain for trial, Mr. Kovach will have his chance to recover from Local 205 and Mr. Shafer for any harm which he can prove they caused him.

between the parties. *Crivelli v. Gen. Motors Corp.* 215 F.3d 386, 394–95 (3d Cir. 2000) (citing RESTATEMENT (SECOND) OF TORTS § 767 (1965)). "The general issue is 'whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.'" *Id.* at 395 (internal citations omitted).

As with his Section 411(a)(2) claim against Local 205, Mr. Kovach relies upon the common law theory of agency in arguing that Mr. Shafer's actions and alleged intent to harm Mr. Kovach's employment with Turner Dairy are attributable to the Union. "To be held liable for the actions of individuals, a union must be shown to have 'instigated, supported, ratified or encouraged' the particular activities in question." *Feather v. United Mine Workers of Am.*, 711 F.2d 530, 539 (1983) (internal citations omitted). Mr. Kovach testified that he did not wish to quit his job with Turner Dairy, but did so because Mr. Shafer's actions made him feel that his life was in grave danger. Kovach Dep., at 191–92.

A jury could find that Mr. Shafer used intimidation and harassment in an effort to prevent Mr. Kovach from raising his seniority concerns for what the Union thought was the thousand and first time, and that Local 205 knew that and allowed it to happen. But there is not a similar quantum of evidence in the record indicating that Mr. Shafer intended to actually harm Mr. Kovach's employment with Turner Dairy, or that Local 205 knew or reasonably should have known that that was Mr. Shafer's intent and then condoned or ratified any conduct directed to that end. Through his counsel at oral argument, Mr. Kovach attempted to weave a feature film-length story about a conspiracy amongst Local 205 management to rid themselves of him, involving Mr. Lickert, Jr. and stretching back to the reign of Mr. Lickert, Sr., the former Union President. *See* Kovach Dep., at 158–160, 189-191. Mr. Kovach was not able at his deposition or at any later time to substantiate any of that, or as is necessary here, any plan or intent on Local

205's part to force Mr. Kovach out of his job at Turner Dairy. In fact, to the precise contrary, Mr. Turner testified that on two occasions, he had decided to fire Mr. Kovach, and Local 205 stepped in to save Mr. Kovach's job. *See* Turner Dep., at 182–187; *see also* Lickert Dep., at 36–37. The Court will therefore grant Local 205's Motion for Summary Judgment as to Mr. Kovach's claim for intentional interference with contractual relations against it.

### D.    Count IV – Negligent Supervision and Retention Claim Against Local 205

To establish negligent supervision or retention under Pennsylvania law, a plaintiff must show that his loss resulted from: (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment; (2) that is committed on the employer's premises; (3) when the employer knows or has reason to know of the necessity and ability to control the employee. *Belmont v. MB Inv. Partners*, 708 F.3d 470, 487–88 (3d Cir. 2013) (citing *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 420 (Pa. 1968)). It is plain from the record that none of the alleged incidents between Mr. Shafer and Mr. Kovach occurred on Local 205 premises. Instead, all of them except for the October 27, 2011 "road rage" incident, which occurred on a public road, happened (if they happened) on Turner Dairy property. Accordingly, Local 205 cannot be liable for negligent supervision and retention of Mr. Shafer as a matter of law, and the Court will grant the Motion for Summary Judgment as to that claim.

### E.    Count V – Assault Claims Against Mr. Shafer and Local 205

Under Pennsylvania law, an assault is "an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Cucinotti v. Ortmann*, 159 A.2d 216, 217 (Pa. 1960). The record contains first-hand testimony regarding several events from which a jury could find Mr. Shafer liable for assault, from his allegedly threatening conduct on May 2, 2011, to his multiple alleged

runs at Mr. Kovach in his truck. The Court will deny Mr. Shafer's Motion as to the assault claim against him.

Mr. Kovach also claims assault against Local 205, again on an agency theory. Assaultive conduct by an employee is within the scope of employment if:

> (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of the force is not unexpectable by the master. Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1272 (Pa. Super. Ct. 1979) (quoting RESTATEMENT (SECOND) OF AGENCY § 228 (1958)). Like Mr. Kovach's intentional interference with contractual relations claim against Local 205, an assault claim based on agency is a bridge too far. It is possible for a jury to conclude from the record that Local 205 knew of Mr. Shafer's alleged verbal harassment and simply allowed it to occur. But that record does not support a finding that any assault of Mr. Kovach by Mr. Shafer was remotely within the type of conduct he was employed to perform or motivated by any purpose to serve Local 205 management's will, or that Mr. Lickert or Mr. Winters had any knowledge of it until after Mr. Kovach ceased his Turner Dairy employment.[18] The Court will dismiss the assault claim against Local 205.[19]

---

[18] At oral argument, Plaintiff's counsel alluded to Mr. Shafer as "The Hammer," intimating that he was some sort of ticking time bomb with a propensity for violence on the job and that Local 205 management knew that and condoned it, which should lead to liability on the part of Local 205 for assault. That characterization is not supported by the record. The most Plaintiff's counsel could uncover from extensive deposition questioning of multiple fact witnesses was that Mr. Turner, who was not at all affiliated with Local 205, knew of an incident in 1994 when Mr. Shafer allegedly stole a possibly adult-themed magazine from a convenience store on his delivery route, and another in 2013 (after the events comprising this lawsuit occurred) when Mr. Shafer allegedly threatened to kill another truck driver. *See* Turner Dep. at 24–31.

[19] That leaves two counts from the FAC: Mr. Kovach's Section 411(a)(2) claim against Local 205 and his state law assault claim against Mr. Shafer. The Court retains supplemental jurisdiction over the assault claim under 28 U.S.C. § 1367, because it and the federal LMRDA claim arise from a "common nucleus of operative fact," *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966), it does not raise a novel or complex issue of state law or substantially predominate over the LMRDA claim, the Court has not dismissed all claims over which it has original

## IV.    CONCLUSION

For the reasons stated in this Opinion, the Court rules as follows on Defendants' Motions for Summary Judgment:

1) Local 205's Motion for Summary Judgment as to Mr. Kovach's claim for violation of 29 U.S.C. § 411(a)(2) is denied;

2) Defendants Shafer and Lickert's Motion for Summary Judgment as to Mr. Kovach's claim for violation of 29 U.S.C. § 501 is granted;

3) Local 205's Motion for Summary Judgment as to Mr. Kovach's claim for intentional interference with contractual relations is granted;

4) Local 205's Motion for Summary Judgment as to Mr. Kovach's claim for negligent supervision and retention is granted;

5) Mr. Shafer's Motion for Summary Judgment as to Mr. Kovach's claim for assault is denied; and

6) Local 205's Motion for Summary Judgment as to Mr. Kovach's claim for assault is granted.

An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated:  September 30, 2014

cc:    All counsel of record

jurisdiction, and no exceptional circumstances present any other compelling reasons for this Court to decline jurisdiction. *See* 28 U.S.C. § 1367(c).